UNITED STATES of America

v.

Jane KEMBER, Appellant.

UNITED STATES of America

v.

Morris BUDLONG, Appellant.

Nos. 80–2563, 80–2564.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 21, 1981.

Decided March 5, 1982.

Certiorari Denied Oct. 4, 1982.
See 103 S.Ct. 73.

See also 487 F.Supp. 1340.

Richard H. Kirschner, Los Angeles, Cal., for appellants.

John A. Shorter, Jr., Washington, D. C., also entered an appearance for appellant Kember in No. 80–2563.

R. Kenneth Mundy, Washington, D. C., also entered an appearance for appellant Budlong in No. 80–2564.

Michael W. Farrell, Asst. U. S. Atty., with whom Charles F. C. Ruff, U. S. Atty., at the time the briefs were filed, John A. Terry, Raymond Banoun, Judith Hetherton, Steven C. Tabackman and Katherine Winfree, Asst. U. S. Attys., Washington, D. C., were on the brief for appellee.

Before ROBINSON, Chief Judge, and ROBB and GINSBURG, Circuit Judges.

ROBB, Circuit Judge:

In August 1978 Kember, Budlong, and nine other officials or employees of the Church of Scientology were indicted in the United States District Court for the District of Columbia. The indictment, in twenty-eight counts, charged the defendants with conspiracy to burglarize government offices and steal government documents, 18 U.S.C. § 371, interception of oral communications, 18 U.S.C. § 2511(1)(a), theft of government documents, 18 U.S.C. § 641, burglary, 22 D.C.Code § 1801(b), and obstruction of justice, 18 U.S.C. § 1503. Warrants were issued for the arrest of Kember and Budlong who were in England, and the United States requested the United Kingdom to extradite them on all the charges. After hearings before the Bow Street Stipendiary Magistrate the defendants were ordered extradited for trial on only the burglary charges. The High Court of Justice, Queens Bench Division, denied the defendants' application for a writ of habeas corpus and on March 13, 1980, Kember and Budlong were surrendered to the custody of the United States. Meanwhile, on October 26, 1979, the nine codefendants were convicted of various offenses charged in the indictment. They appealed, and on October 2, 1981, the convictions were affirmed. *United States v. Heldt*, 215 U.S.App.D.C. 206, 668 F.2d 1238 (1981) (Per Curiam).

Before their trial in the District Court Kember and Budlong moved for an order divesting the court of jurisdiction. The ground of their motion was that because they had been extradited for trial on only the burglary counts in the indictment, charging violations of the District of Columbia Code, the District Court lacked subject matter jurisdiction over the case. The motion was denied. *United States v. Kember*, 487 F.Supp. 1340 (D.D.C.1980). The defendants also moved to suppress documentary evidence seized by the government in a search of the offices of Scientology in Los Angeles. This motion was denied upon the ground that Kember and Budlong had failed to demonstrate a legitimate expectation of privacy in the premises searched. Thereafter the defendants went to trial before a jury.

During the trial of Kember and Budlong several of the convicted codefendants, who had been subpoenaed to testify for the government under grants of use immunity, refused to testify and were held in civil contempt by the District Court. They appealed on the ground, among others, that because Kember and Budlong were extradited and arraigned only on "local" charges, the court lacked jurisdiction to try them and the court therefore had no jurisdiction

to compel the codefendants' testimony. This court held, however, that because federal and local offenses were properly joined in the original indictment the District Court had power to try Kember and Budlong, so that no jurisdictional barrier blocked the demand for the codefendants' testimony. *United States v. Kember*, 208 U.S.App.D.C. 380, 648 F.2d 1354 (1980) (Per Curiam). Thereafter Kember and Budlong were tried and found guilty on nine counts of burglary and each was sentenced to concurrent terms of imprisonment of two to six years. These appeals followed.

The government's evidence at trial established that Kember and Budlong were two of the highest officials of Scientology. At the time of the burglaries charged, Kember was Guardian World-Wide, a position subordinate only to that of L. Ron Hubbard, the founder of Scientology, and his wife Mary Sue Hubbard. The Guardian's Office, which had been established "to help [L. Ron Hubbard] enforce and issue policy, [and] to safeguard Scientology" set forth basic policy by means of Guardian Orders, which could be issued only by L. Ron Hubbard, Mary Sue Hubbard, or Kember. Budlong, as Deputy Guardian for Information World-Wide, supervised the Scientology Information Bureau which included the United States Information Bureau with headquarters in Los Angeles. An essential function of the Bureau was the collection of information of interest to Scientology by overt and covert means, including the theft of documents from government agencies.

The government's evidence consisted chiefly of testimony by Michael Meisner, a former official of Scientology, and documents seized by FBI agents from the offices of Scientology in Los Angeles. Without going into detail, it is enough to say that the proof established a project undertaken by Kember, Budlong, and other officials of Scientology, to steal documents of interest to Scientology, including litigation files of government attorneys, from various offices of the United States government. The thefts were accomplished by means of burglaries of government offices. As the district judge summarized the evidence:

"the determination was made at the top to get every shred of evidence that the United States Government has on the Church of Scientology." These activities were carried on at the direction of the officers of Scientology, including Kember and Budlong. We refer to the statement of facts set out in some detail in *United States v. Heldt*, 215 U.S.App.D.C. 206, 668 F.2d 1238 (1981) (Per Curiam).

On this appeal Kember and Budlong aver that the District Court committed four prejudicial errors. First, they argue that the court abused its discretion by retaining the case when the only counts left for trial were those alleging violations of the District of Columbia Code. Second, they contend that the court violated the Anglo-American Extradition Treaty of 1977 by admitting "evidence of facts not submitted to the British courts during the extradition proceedings" and "evidence of facts which were not the 'facts in respect of which extradition has been granted.'" Third, they argue that the district judge erred by refusing to disqualify the United States Attorneys Office, or in the alternative, members of that Office, for bias and conflict of interest. Finally, they say the court should have sustained their motion to suppress. We consider each issue in turn.

RETENTION OF THE CASE IN FEDERAL COURT

The District of Columbia Code, Section 11–502(3), gives the United States District Court for the District of Columbia jurisdiction of "[a]ny offense under any law applicable exclusively to the District of Columbia which offense is joined in the same information or indictment with any Federal offense". In the indictment against Kember and Budlong, counts charging burglary in violation of the District of Columbia Code, 22 D.C.Code § 1801(b), were joined with counts charging conspiracy, interception of oral communications, and theft of government documents in violation of the Federal Criminal Code, 18 U.S.C. § 371, 18 U.S.C. § 2511(1)(a), and 18 U.S.C. § 641. Because they were extradited for trial and

were tried for only the local burglary offenses Kember and Budlong say they should have been tried in the District of Columbia Superior Court. They argue that the District Court abused its discretion by failing to divest itself of jurisdiction. We do not agree.

■ As we have said, this court held in *United States v. Kember*, 208 U.S.App.D.C. 380, 648 F.2d 1354 (1980) (Per Curiam), that the District Court had the power to try Kember and Budlong for the local offenses: "We believe that, so long as an indictment properly joins federal and local offenses under Fed.R.Crim.P. 8 . . . Congress intended to give the federal court power to try the local offense. The statute does not suggest that any disposition of the federal offense, subsequent to proper joinder in an indictment, withdraws power over the local offense." *Id.* at 385, 648 F.2d at 1359 (footnote and citation omitted). We noted, however, that the District Court must use discretion in exercising its power when the only issues presented for resolution are those based on local law:

> Just as a federal court asked to exercise pendent jurisdiction over a state civil claim should decline to do so if the federal claims have been dismissed before trial . . . the U.S. District Court for the District of Columbia should decline to try local offenses when those offenses have been disassociated from any federal charges prior to trial and retention of the case would not comport with "[t]he responsibilities of the District Court with respect to matters of federal concern."
> . . . We underscore, however, that this is a matter of sound exercise of the court's discretion, not a question of its power.

*Id.* at 386, 648 F.2d at 1360 (quoting *United States v. Jackson*, 183 U.S.App.D.C. 270, 281, 562 F.2d 789, 800 (1977)) (citations

omitted). In other words, the federal court must dismiss a criminal prosecution when federal charges have faded from the case prior to trial, leaving only District of Columbia offenses for adjudication, unless the court determines, in its discretion, that retention of the case is warranted by remaining matters of legitimate federal concern.[1]

■ The defendants contend that the District Court abused its discretion because any matters of federal concern in this case are of a trivial nature and do not justify retention of the case in a federal court. We cannot agree. The defendants were tried for illegally entering United States government offices with intent to steal property owned by the United States. These violations of the District of Columbia Code were offenses against the United States, prosecuted in the name of the United States, and were "of unique concern to the United States." *United States v. Kember*, 208 U.S. App.D.C. 380, 384, 648 F.2d 1354, 1358 n.3, 1359 (1980) (Per Curiam); *Goode v. Markley*, 195 U.S.App.D.C. 391, 394, 603 F.2d 973, 976 (1979), *cert. denied*, 444 U.S. 1083, 100 S.Ct. 1039, 62 L.Ed.2d 768 (1980). *See also United States v. Cella*, 37 App.D.C. 423 (1911), *cert. denied*, 223 U.S. 728, 32 S.Ct. 526, 56 L.Ed. 633 (1912).

The defendants attempt to cast their argument in a different form by averring that even if the case involves matters of legitimate federal concern the District Court abused its discretion because retention of the case opposed considerations of judicial economy, convenience, and fairness to litigants. The defendants rely on *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), in support of their contention that such factors must be considered by the federal court. Citation to the *Gibbs* case does not help the defendants. They make no claim

---

1. The defendants rely on *United States v. Jackson*, 183 U.S.App.D.C. 270, 562 F.2d 789 (1977), holding that the district court erred in retaining jurisdiction when the federal charges had been dismissed on pretrial motion. In *United States v. Kember*, however, we read the opinion in *Jackson* as holding only that the federal and local counts were improperly joined in the in-

dictment and that Congress could not have intended to empower the federal courts to try D.C. offenses unless those offenses were properly joined. We rejected the alternate holding by the *Jackson* court that the district court lost jurisdiction to try the local offenses. *United States v. Kember*, 208 U.S.App.D.C. 380, 385, 648 F.2d 1354, 1359 n.9 (1980) (Per Curiam).

of inconvenience to them; on the other hand, had the case been dismissed by the District Court the government would have suffered great inconvenience, for dismissal would have required a new indictment in Superior Court and new extradition proceedings. A new beginning would not have promoted judicial economy; when the motion to divest jurisdiction was made, the District Court had already invested substantial time in the case. The argument that retention of jurisdiction was unfair to the defendants is likewise untenable. They say that the District Court was somehow biased against them because of the trial and sentencing of the codefendants, that it was unfair to try them in the United States Courthouse when that was one of the buildings they were alleged to have burgled, and that those convicted of burglary in the Superior Court serve less time in prison than those convicted in federal court. We think these contentions are wholly without merit.

In sum, we hold that the District Court did not abuse its discretion by retaining jurisdiction over the defendants' trial. Matters of unique federal concern remained dominant in the case, considerations of judicial economy and litigational convenience weighed heavily in support of the District Court's decision, and no tenable argument can be made that federal court trial was unfair to the defendants.

### THE ALLEGED TREATY VIOLATIONS

Kember and Budlong were extradited from England pursuant to the Anglo-American Extradition Treaty of 1977. Article XII of that Treaty provides in part:

> A person extradited shall not be detained or proceeded against in the territory of the requesting Party for any offense other than an extraditable offense established by the facts in respect of which his extradition has been granted, or on account of any other matters....

Anglo-American Extradition Treaty of 1977, Article XII(1), 28 U.S.T. 227, T.I.A.S. No. 8468. The defendants contend that the District Court violated the Treaty by admitting evidence of facts that went beyond

"the facts in respect of which" extradition had been granted. In particular they complain of (1) evidence of a conspiracy to obtain government documents illegally, (2) evidence that confidential information contained in a government report which had been illegally acquired was later disseminated to the press by Scientology, (3) evidence concerning the use of electronic listening devices planted in the Internal Revenue Service offices by Scientologists, and (4) evidence that the Scientologists used a code in transmitting information. According to the defendants none of these facts was presented to the British courts during the extradition proceedings, and in any event they relate only to charges for which extradition was denied or for which extradition was not sought. It follows, the defendants argue, that such facts could not be "facts in respect of which ... extradition has been granted", and they could not be used to establish the defendants' guilt of the offenses for which they were extradited.

■ The defendants concede, as they must, that under the Federal Rules of Evidence the evidence about which they complain was competent and admissible in the burglary prosecution. Brief for Appellants at 38, 62. They argue, however, that Article XII of the Treaty restricts the prosecution's case at trial to those facts which were presented in the extradition proceedings and upon which extradition was granted. This theory would require a government requesting extradition to present to the foreign magistrate every fact known to it upon which it intends to rely at trial. We think such an interpretation of the Treaty is contrary to the authorities and offensive to common sense.

Extradition proceedings before a magistrate are not a trial but rather a preliminary examination to determine whether a case is made out which will justify the holding of the accused and his surrender to the demanding nation. *Collins v. Loisel*, 259 U.S. 309, 316, 42 S.Ct. 469, 472, 66 L.Ed. 956 (1922); *Charlton v. Kelly*, 229 U.S. 447, 460, 33 S.Ct. 945, 949, 57 L.Ed. 1274 (1913);

*Benson v. McMahon,* 127 U.S. 457, 463, 8 S.Ct. 1240, 1243, 32 L.Ed. 234 (1888); *Jhirad v. Ferrandina,* 536 F.2d 478, 482 (2d Cir.), cert. denied, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976). As the Supreme Court said in *Collins v. Loisel,* quoting from *In re Wadge,* 15 F. 864, 866 (1883), if more than a *prima facie* case were required "[t]he result would be that the foreign government, though entitled by the terms of the treaty to the extradition of the accused for the purpose of a trial where the crime was committed, would be compelled to go into a full trial on the merits in a foreign country, under all the disadvantages of such a situation, and could not obtain extradition until after it had procured a conviction of the accused upon a full and substantial trial here. This would be in plain contravention of the intent and meaning of the extradition treaties." 259 U.S. at 316, 42 S.Ct. at 472. Thus, in ordering the extradition of Kember and Budlong, the British courts required only a showing of a *prima facie* case of burglary; there was no suggestion that the proceedings were a dress rehearsal of a trial. The Stipendiary Magistrate in his decision stated: "I am not saying whether I would find the defendants guilty or not, my function is to say whether a jury properly directed could convict." *See* Appendix for Appellee at 28. In its judgment sustaining the Magistrate's decision, the Queens Bench Division (Lord Chief Justice Widgery and Mr. Justice Griffiths) noted that the Magistrate was "satisfied that the facts revealed a *prima facie* case of burglary" and that "there has been no suggestion that the evidence before the magistrate did not establish a *prima facia* case of burglary against the Applicants both according to American and English law." *See* Appendix for Appellee at 2.

Notwithstanding the authoritative statement of the Stipendiary Magistrate and the Queens Bench Division that the government was required to produce only a *prima facie* case before the Magistrate, the defendants insist that "all of the facts of which the requesting state is aware should be presented to the asylum state during the extradition proceeding." Brief for Appellants at 43. From this it follows, the defendants say, that any facts not presented to the Magistrate may not be proven at the trial. According to the defendants this result is required by the language of Article XII of the Extradition Treaty of 1977. The defendants emphasize that the wording of Article XII differs from that of the equivalent provision in the Anglo-American Extradition Treaty of 1935 which provides in part:

> A person surrendered can in no case be kept in custody or be brought to trial in the territories of the High Contracting Party to whom the surrender has been made for any other crime or offence, or on account of any other matters, than those for which extradition shall have taken place, until he has been restored, or has had an opportunity of returning, to the territories of the High Contracting Party by whom he has been surrendered
> . . . .

Anglo-American Extradition Treaty of 1935, Article XII, 47 Stat. 2122. The defendants conclude "that in interpreting Article XII of the current Treaty, the court must find that the law of the United States extends *some greater measure of protection* than it did under the 1935 Treaty." Brief for Appellants at 42–43 (emphasis in original). This "greater measure of protection" is said to be that the government at trial is prohibited "from using facts of *which it was aware, but chose not to submit for extradition.*" Brief for Appellants at 43 (emphasis in original). We are not persuaded by the defendants' argument.

Article XII of the 1977 Treaty is patterned after section 3 of the British Extradition Act of 1870 which governs extradition from Great Britain.[2] Section 3 states in part:

---

2. The minutes prepared by the United States Department of State during the treaty negotiations state that Article XII "was drafted in accordance with the extradition law of the United Kingdom." Minutes of Extradition Negotiations 15 (Feb. 5, 1970).

A fugitive criminal shall not be surrendered to a foreign state unless provision is made by the law of that state, or by arrangement that the fugitive criminal shall not, until he has been restored or had an opportunity of returning to Her Majesty's dominions, be detained or tried in that foreign state for any offence committed prior to his surrender *other than the extradition crime proved by the facts on which the surrender is grounded.*

British Extradition Act of 1870, 33 & 34 Vict., Ch. 52, § 3(2) (emphasis added). In *Regina v. Aubrey-Fletcher, Ex parte Ross-Munro* [1968] 1 Q.B. 620, the Queens Bench Division considered and interpreted section 19 of the Extradition Act of 1870, which is complementary to section 3. The precise point considered was the contention of applicant Ross-Munro that section 19 prohibited consideration of evidence relating to facts other than the facts on which his extradition was granted. The court (Lord Parker, C. J., Salmon, L. J., and Widgery, J.) held:

> The point involved here is a novel one in so far as no previous decision appears to have been given on the point. It depends upon the true construction of section 19 of the Extradition Act, 1870; that section reads:
>
> "Where, in pursuance of any arrangement with a foreign state, any person accused or convicted of any crime which, if committed in England, would be one of the crimes described in schedule I to this Act is surrendered by that foreign state, such person shall not, until he has been restored or had an opportunity of returning to such foreign state, be triable or tried for any offence committed prior to the surrender in any part of Her Majesty's dominions *other than such of the said crimes as may be proved by the facts on which the surrender is grounded.*"
>
> *It is convenient at once to state that that section is complementary to section 3(2) of the Act which is dealing with the case of a fugitive criminal, that is the* *foreigner, when he is surrendered by this country to the foreign state, . . .*

The argument for the applicant is put very concisely . . . in this form: that the person concerned who is surrendered to this country cannot be committed and put in peril of conviction on any facts other than those put forward to secure his surrender.

> \* \* \* \* \* \*

This is a novel point and, if it be right, it has an alarming consequence. It would mean that not only is this a restriction on the procedure on committal, a restriction on the receiving of evidence, but indeed logically it would affect the trial, because no evidence would be admissible at the trial unless it was in regard to facts raised in the surrender documents. Another alarming consequence would be that if, when the person concerned arrives in this country after being surrendered by the foreign state, he is arrested, cautioned and questioned by a police officer, evidence of what he said, whether for him or against him, would be quite inadmissible.

In my judgment Parliament cannot have intended any such thing in this section. Two things are quite clear, as it seems to me. One is that that section is designed to prevent a man from being tried after his surrender for a crime other than that for which he has been extradited . . . .

Secondly, . . . the section is not in any way intended to interfere with the ordinary procedures and laws of evidence in this country whether in committal proceedings or at the trial . . . .

> \* \* \* \* \* \*

It is, I am quite satisfied, in no sense intended to be a restriction, for instance, on the evidence which can be called in this country, whether it be in the committal proceedings or in the trial itself.

> \* \* \* \* \* \*

When, as in this case, the man who has been surrendered is being charged in this country with the very offences in respect of which the warrant was issued, and for the trial of which he was surrendered by the foreign country, it seems to me that it would be putting a very strained, artificial and indeed ridiculous construction on section 19, to interpret it in the sense suggested. . . .

*Id.* at 626–29 (emphasis added). The reasoning of the British court with respect to section 19 of the Extradition Act of 1870 applies with equal force to the "complementary" section 3(2) of that Act and to Article XII of the 1977 Treaty, which is derived from section 3(2).

 A treaty must be interpreted so as to carry out the intention of the parties; its meaning is to be ascertained by the same rules of construction and reasoning which apply to the interpretation of private contracts. *Tucker v. Alexandroff*, 183 U.S. 424, 437, 22 S.Ct. 195, 200, 46 L.Ed. 264 (1902). Applying this test to Article XII we think the construction placed upon it by the defendants is, in the language of the British court, "a very strained, artificial and indeed ridiculous construction", and one which could not have been intended by the contracting parties. If the defendants' contention is correct Article XII radically changed both the law applicable to extradition hearings and the rules of evidence in both the United States and British courts. We hold that no such result could have been intended. We think Article XII merely recognized and applied the "principle of specialty" which requires that a requisitioning state may not, without the permission of the asylum state, try or punish a fugitive for any crimes committed before the extradition except the crimes for which he was extradited. *Shapiro v. Ferrandina*, 478 F.2d 894, 905 (2d Cir.), *cert. denied*, 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973); *see United States v. Rauscher*, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886); *In re Woodall*, 57 L.J. 72 (C.A.Cr.1888). The doctrine has nothing to do with the "scope of proof

admissible into evidence in the judicial forum of the requisitioning state". *United States v. Flores*, 538 F.2d 939, 944 (2d Cir. 1976). In that case Flores was extradited to the United States for trial on conspiracy charges "expressly limited with respect to time to the acts committed between September 3, 1970 and April 30, 1971, excluding any previous or subsequent acts." *Id.* at 941. The Circuit Court of Appeals held that although prosecution for earlier offenses was barred, evidence of such offenses might be introduced to establish the crimes for which Flores was tried. In other words, "the normal procedural and evidentiary rules of our domestic courts continue to control Flores' prosecution." *Id.* at 945. We hold that the normal procedural and evidentiary rules continued to apply in the case of Kember and Budlong.

## THE ALLEGED DISQUALIFICATION OF THE PROSECUTORS

 Kember and Budlong argue that the United States Attorneys Office had a disqualifying emotional interest in the outcome of the case because it was the "victim" of one of the crimes alleged in the indictment. In addition, they contend that two of the prosecutors were disqualified because they were defendants in a civil action filed by Scientology ten days after the search of the Scientology offices in Los Angeles. This suit alleged that the search was conducted in bad faith, with the intention of violating Scientology's constitutional rights. Our opinion in *United States v. Heldt*, 215 U.S.App.D.C. 206, 668 F.2d 1238 (1981) (Per Curiam), disposes of the contention that the United States Attorneys Office was disqualified because it was the victim of the crime. As for the alleged disqualification of the Assistant United States Attorneys we need only to emphasize that there was no evidence of bad faith or any misconduct on their part. In the absence of such evidence a defendant cannot disqualify a prosecutor by the mere filing of a lawsuit. As we said in the *Heldt* case,

The potential conflict of interest that might result from a personal civil suit filed against an Assistant United States Attorney (AUSA) by a defendant in a criminal case for acts undertaken by the AUSA in his official capacity in the criminal matter would have to be very strong before disqualification would be justified. It could not be justified by mere inference from the filing of the suit but would require *proof,* by clear and convincing evidence, of a prima facie case of misconduct on the part of the AUSA.

*Id.* at 244–245 n.80, 668 F.2d at 1276–77 n.80 (emphasis in original). The defendants failed to produce the proof required by this standard.

THE MOTION TO SUPPRESS

Kember and Budlong argue that their constitutional rights were violated by the search of the Scientology offices. Our opinion in the *Heldt* case disposed of this point.

The judgments are

*Affirmed.*