Edward TEMENGIL; Justin Manglona; Hiromi Rdiall; Fred Heine; Manuel Sablan; Ramon Rechebei; Charles Muller, individually and on behalf of all others similarly situated, Plaintiffs–Appellees/Cross–Appellants,

v.

TRUST TERRITORY OF the PACIFIC ISLANDS; Janet McCoy, High Commissioner of the Trust Territory of the Pacific Islands; United States Department of the Interior; Manuel Lujon, Jr.,* Secretary of the Interior; United States of America, Defendants–Appellants/Cross–Appellees.

Nos. 88–1548, 88–1639 and 88–1675.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 10, 1989.

Decided July 28, 1989.

---

* Manuel Lujon, Jr. is substituted for his predecessor Cecil Andrus as Secretary of Interior. Fed.

R.App.P. 43(c)(1).

Traylor T. Mercer, Carlsmith, Wichman, Case, Mukai & Ichiki, Saipan, MP; Jacob M. Lewis, Civ. Div., Dept. of Justice, Washington, D.C., for defendants-appellants/cross-appellees.

Douglas F. Cushnie, Saipan, MP, for plaintiffs-appellees/cross-appellants.

Before BROWNING, BEEZER and KOZINSKI, Circuit Judges.

BEEZER, Circuit Judge:

This appeal stems from a class action employment discrimination suit brought by Asian and Micronesian citizens ("Plaintiffs") who worked for the government of the Trust Territory of the Pacific Islands. Defendants can be divided into two groups: the Trust Territory government and Janet McCoy, High Commissioner (collectively "Trust Defendants"); and the United States Department of the Interior, the Secretary of the Interior, and the United States (collectively "Federal Defendants").

Defendants appeal monetary damages awarded against the Trust Defendants. (Federal Defendants decline to appeal injunctive relief awarded against them because the issue is moot.) Plaintiffs cross-appeal the dismissal of monetary claims against the Federal Defendants and the dismissal of Title VI and Title VII claims against all defendants.

Litigation in this matter lasted over six years. The decision which is appealed was issued in 1983, and is reprinted in 33 Fair Empl.Prac.Cas. (BNA) 1027 (D.N. Mar. I. 1983). That order was made final by an order issued on December 1, 1987. Most of the facts pertinent to the litigation were stipulated by the parties; a few other facts were determined by the district court. Factual determinations are reviewed for clear error, questions of law are reviewed de novo, and mixed questions of fact and law are reviewed de novo. *United States v. McConney*, 728 F.2d 1195, 1199–1204 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

We reverse the determination of jurisdiction as to the Trust Defendants, and affirm the dismissals of complaints against Trust Defendants, and affirm the dismissals of complaints against Trust and Federal Defendants.

I

The early history of the Trust Territory has been well chronicled in our earlier opinions. Briefly, the Trust Territory encompassed the pacific islands and atolls known as Micronesia. Between World Wars I and II, Micronesia was administered under a class C mandate from the League of Nations. During World War II the United States military occupied many of the islands, using them as steppingstones in its drive towards Japan. Following World War II, Micronesia joined the list of dependent non-self governing areas provided for in articles 73–91 of the newly created United Nations Charter. *See* Note, *Trusteeship Compared with Mandate*, 49 Mich. L.Rev. 1199 (1951).

Following intense debate by members of the United Nations, the United States and the Security Council of the United Nations entered into a Trusteeship Agreement under which the United States accepted administrative responsibility for the people of Micronesia. *See* Trusteeship Agreement for the Former Japanese Mandated Islands, July 18, 1947, United Nations–United States, 61 Stat. 3301, T.I.A.S. No. 1665. The paramount duty of the United States was to steward Micronesia to self government. *Id.*, art. 6.1; *see Gale v. Andrus*, 643 F.2d 826, 830 (D.C.Cir.1980).[1] The area became known as the Trust Territory of the Pacific Islands.

To fulfill its administrative duties, the United States—through the Department of the Interior—created a bureaucracy known as the Trust Territory government. *See* Exec. Order No. 11021, 27 Fed.Reg. 4409

---

1. The fiduciary responsibilities of the United States have been compared to those still held by it with regards to Native Americans; however, at least one commentator warns that the Trusteeship Agreement was intended to promote rather than prevent Micronesian rights. *See* 33 Fair Empl.Prac.Cas. at 1032 n. 17 (citing J. McNeill, The Strategic Trust Territory in International Law 118–19 (doctoral thesis reproduced by University Microfilms International, 1976)).

(1962). The executive functions of the Trust Territory government were exercised by a High Commissioner, who was appointed by the President of the United States with the advice and consent of the Senate. 48 U.S.C. § 1681a. Ultimate discretionary control over the Trust Territory government was retained by the Secretary of the Interior. Secretarial Order No. 2918, 34 Fed.Reg. 157 (1968).

The political and sovereign status of the Trust Territory and the Trust Territory government puzzled legislators, courts, and commentators from the beginning. *See, e.g., Trusteeship Agreement For the Territory of the Pacific Islands: Hearings on S.J.Res. 143 Before the Senate Comm. on Foreign Relations,* 80th Cong., 1st Sess. 8, 16–17, 21–22 (1947); *see generally,* Note, *A Macrostudy of Micronesia: The Ending of a Trusteeship,* 1972 N.Y.L.F. 204–07.

In 1969 the people of Micronesia began negotiations with the United States through the Congress of Micronesia's Joint Committee on future status. At that time, the Trust Territory was divided into several administrative districts. In 1972, the administrative district designated as the Northern Mariana Islands began separate negotiations. *See* S.Rep. No. 596, 94th Cong., 2d Sess. 4–5, *reprinted in* 1976 U.S. Code Cong. & Admin. News 448, 452. It is with these negotiations that closer examination of the history of the Trust Territory becomes important to this appeal.

The Northern Mariana Islands' negotiations resulted, in 1976, in the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America. In light of the Covenant, the Secretary of Interior created a separate bureaucracy to govern the Northern Mariana Islands and divested the Trust Territory government of control within the area.[2] Secretarial Order No. 2989, 41 Fed.Reg. 15,892 (1976). The Trust Territory government, however, continued to be located in Saipan, which is part of the Northern Mariana Islands.

Many of the provisions of the Covenant became effective on January 9, 1978. At that time, the Constitution of the Northern Mariana Islands took effect and the people became self governing.[3] Proclamation No. 4534, 42 Fed.Reg. 56,593 (1977). Furthermore, under section 502 of the Covenant, most of the laws of the United States were made applicable within the area. However, although the United States for the most part dealt with the Northern Mariana Islands as though it was a Commonwealth beginning in 1978, the area formally remained a part of the Trust Territory until the Trusteeship Agreement was dissolved in 1986.

Meanwhile, the remainder of the Trust Territory divided itself into three regions: the Federated States, the Marshall Islands, and Palau. Each of these regions formed its own governments and negotiated Compacts of Free Association with the United States. By 1979, the Trust Territory government was divested of most of its functions, and retained only certain accounting and budgeting functions relating to federal assistance. Secretarial Order No. 3039, 44 Fed.Reg. 28,116 (1979).

In 1986, the Trusteeship Agreement was formally dissolved with respect to the Commonwealth of the Northern Mariana Islands, the Federated States of Micronesia, and the Republic of the Marshall Islands. Proclamation No. 5564, 51 Fed.Reg. 40,399 (1986), *reprinted in* 48 U.S.C. § 1681 note. Thus, the Commonwealth is now a part of the sovereign United States and the Federated States and Marshall Islands are fully independent, sovereign nations. *See* Covenant, § 101; Compact of Free Association Act of 1985, Pub.L. No. 99–239, 99 Stat. 1770. The Trusteeship Agreement remains in effect only for Palau.[4] The Republic of Palau, however, operates as an indepen-

---

**2.** The High Court of the Trust Territory retained some residual authority.

**3.** The temporary separate bureaucracy established by the Secretary of Interior was dissolved.

**4.** Palau has reconsidered its Compact of Free Association with the United States and is in the process of approving a different arrangement.

dent nation; it has negotiated treaties with other nations and has joined several international organizations on its own standing. *See Morgan Guaranty Trust Co. v. Republic of Palau,* 639 F.Supp. 706, 708–09 (S.D.N.Y.1986).

The other facts pertinent to this appeal concern the Trust Territory government's compensation plan. Defendants do not appeal the district court's finding that the employment practice complained of by plaintiffs was discriminatory.[5] Under this three-level compensation plan, citizens of Asian and Micronesian countries received less pay than citizens of the United States or Europe. Citizens of other nations received pay between the levels of those two groups. The version of this plan in practice at the time of the plaintiffs' challenge was mandated by High Commissioner Executive Order No. 119 (May 25, 1979). The three-level plan, however, had been in practice for some time. *See* Mink, *Micronesia: Our Bungled Trust,* 6 Tex. Int'l L.J. 181, 187 (1971).

## II

### A. *Section 1981 and 1983 Claims Against Trust Defendants*

■ Sections 1981 and 1983 of Title 42 of the United States Code were made applicable to the Northern Mariana Islands through section 502 of the Covenant. *See Fleming v. Department of Public Safety,* 837 F.2d 401, 404–05 (9th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 222, 102 L.Ed.2d 212 (1988). The district court ruled that those parts of the Trust Territory government that were physically located within the commonwealth were subject to the laws of the commonwealth. A district court's determination of jurisdiction is reviewed de novo. *Pacific Atlantic Trading Co. v. M/V Main Express,* 758 F.2d 1325, 1326 (9th Cir.1985). Our review leads us to conclude that sections 1981 and 1983 do not apply to the Trust Territory government.

Section 502(a)(2) of the Covenant makes applicable to the commonwealth "those

laws ... which are applicable to Guam and which are of general application to the several States as they are applicable to the several States." 48 U.S.C. § 1681 note.

Defendants argue that the wholesale application of United States law in the Northern Marianas was not meant to bind the Trust Territory government. They rely on the District of Columbia Circuit's rule that "the laws of the United States do *not* automatically apply to the Territory unless they are specifically made applicable by Congress." *Gale v. Andrus,* 643 F.2d 826, 830 (D.C.Cir.1980); *see People of Enewetak v. Laird,* 353 F.Supp. 811, 815 (D.Haw.1973) (stating federal law not automatically applicable to trust territory; but finding it applicable by using legislative history); *see also People of Saipan v. Department of Interior,* 502 F.2d 90, 96 n. 6 (9th Cir.1974), *cert. denied,* 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975). Defendants further argue that the Trust Territory government's location in Saipan is merely an "historical accident" that should not be allowed to give the commonwealth undue leverage. We agree.

We have previously described the Trust Territory government as a "quasi-sovereign" entity. *McComish v. Commissioner,* 580 F.2d 1323, 1330 (9th Cir.1978). This quasi-sovereignty stemmed from the unique nature of the Trust Territory government: administered to a large degree by the United States, but vested with the incipient self government of the people of Micronesia. *Id.* at 1328–30.

The unique nature of the Trust Territory government has lead to seemingly inconsistent results. We have, for example, held the Trust Territory government to be like a territorial government in the context of some statutes, *see People of Saipan,* 502 F.2d at 94–95, and held it to be like a foreign government in the context of other statutes, *McComish,* 580 F.2d at 1330. Any inconsistency, however, is illusory: the underlying constant has been careful

---

5. It appears that the vestigial Trust Territory government now employs only four people. The role of the High Commissioner has been abolished, and the three-level compensation plan is no longer used.

scrutiny of the purpose of the statute and how Congress intended it to affect the Trust Territory government. *Id.* at 1326.

The district court's consideration of the Trust Territory government's sovereignty was based on the real-world nature of the Trust Territory government.[6] For the bulk of the time covered by the lawsuit[7] the Trust Territory government had no discretionary power and the four administrative regions largely took on the task of self governance. How, ask the plaintiffs, can the Trust Territory government be assigned sovereignty when sovereignty has been passed on to the governments of Palau, the Marshall Islands, and the Federated States?

■ These arguments would be more persuasive if our decision was based on the metaphysics of sovereignty. It is not. Our decision is based on our belief that Congress did not intend section 502 of the Covenant to govern the working of the Trust Territory government. The historical treatment of the Trust Territory government as quasi-sovereign merely leads us to that conclusion.

Because we find that sections 1981 and 1983 do not apply to the Trust Territory government, we must also reverse the district court's award of attorneys' fees. *See Rinker v. County of Napa*, 831 F.2d 829, 832 (9th Cir.1987).

**B.** *Trusteeship Agreement and Trust Territory Code Claims Against Trust Defendants*

In contrast to federal civil rights' laws, the activities of the Trust Territory government clearly are constrained by the Trusteeship Agreement. *See McComish*, 580 F.2d at 1328. In *People of Saipan* we held that the Trusteeship Agreement created "direct, affirmative, and judicially enforceable rights" in equity. 502 F.2d at 97. We also stated that "[w]e refuse to leave the plaintiffs without a forum which can hear their claim that the High Commissioner has

violated the duties assumed by the United States in the Trusteeship Agreement." *Id.* at 100. Using *People of Saipan* as its starting point, the district court held that the Trusteeship Agreement and the Trust Territory Code can be used as the basis for monetary damages. We reverse.

Once again, although the parties vigorously argue the issue of sovereignty, it is not controlling. Our characterization of the Trust Territory as similar to a state or territory has led several district courts to hold that the Trust Territory government is not protected by the Foreign Sovereign Immunity Act. *E.g., Sablan Constr. Corp. v. Government of Trust Territory*, 526 F.Supp. 135, 138 (D.N. Mar. I. 1981); *People of Saipan v. Department of Interior*, 356 F.Supp. 645, 656 (D.Haw.1973).

■ Even if the Trust Territory government is cloaked in some type of sovereignty, that does not make it immune in other sovereigns' courts. *See Nevada v. Hall*, 440 U.S. 410, 99 S.Ct. 1182, 59 L.Ed.2d 416 (1979). Immunity in another sovereign's court "must be found either in an agreement, express or implied, between the two sovereigns, or in the voluntary decision of the second to respect the dignity of the first as a matter of comity." *Id.* at 416, 99 S.Ct. at 1186 We have already held that the Trusteeship Agreement gives us jurisdiction over the Trust Territory government. *People of Saipan*, 502 F.2d at 100. Therefore, our analysis must focus on whether the Trusteeship Agreement and the Trust Territory Code themselves imply a cause of private action.

The Trusteeship Agreement is a treaty, as well as the "basic constitutional document" of the Trust Territory of the Pacific Islands. *People of Saipan*, 502 F.2d at 96, 98. "A treaty may create judicially enforceable rights *if the signing parties so desire.*" *Cardenas v. Smith*, 733 F.2d 909, 918 (D.C.Cir.1984) (emphasis added); *see United States v. Kember*, 685 F.2d 451, 458 (D.C.Cir.)("A treaty must be interpreted so as to carry out the intention of the

---

6. *McComish* was decided before the Trust Territory government was divested of discretionary power.

7. Plaintiffs filed their complaint in 1981. Final judgment was rendered in 1987.

parties; its meaning is to be ascertained by the same rules of construction and reasoning which apply to the interpretation of private contracts."), *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 72 (1982); *cf. Bonanno v. United States*, 12 Cl.Ct. 769, 772 (1987) (discussing interpretation of treaty as part of federal law). Thus, the question before us is whether the United States, as a signatory to the Trusteeship Agreement, intended the treaty to create an avenue for monetary remedy.[8]

Plaintiffs urge upon us the underlying understanding that the Trust would be administered for the benefit of the Micronesian people as evidence that the United States intended a right to monetary damages. We disagree. Administering the Trust for the benefit of the Micronesian people means that the people will not be exploited and that self governance will be sought. It does not mean that the United States intended them to have financial recourse if mistakes were made.

We find no external indication that Congress or the Executive[9] intended the Trusteeship Agreement to create a right to monetary damages. Nor does anything in the language of the Trusteeship Agreement indicate an intent to create private rights to money damages.

■ The Trust Territory Code is not a treaty. Rather it was promulgated by the Secretary of the Interior pursuant to authority delegated by Congress. There is a dearth of caselaw regarding the interpretation of territorial law promulgated by a United States cabinet member; once again we look to the intent of the drafting party. We find no indication that the Secretary of the Interior (or Congress through the Secretary) intended the Trust Territory Code to give rise to monetary damages.

During oral argument, plaintiffs' counsel warned us that reversing the district court would place the Trust Territory government above the law. This is not true. The Trust Territory government is constrained by the Trusteeship Agreement; the plaintiffs' success in obtaining injunctive relief illustrates that constraint. Our holding today does not free the Trust Territory government from the constraint of law, merely from financial obligation when it strays beyond the law's constraints.

## C. *Title VI Complaints*

■ Plaintiffs cross appeal claiming error in the district court's dismissal of its Title VI claims against the Trust Territory government is meritless. "Nothing contained in [Title VI] shall be construed to authorize action under [Title VI] ... except where a primary objective of the Federal financial assistance is to provide employment." 42 U.S.C. § 2000d–3.

Plaintiffs argue that although the primary function of the Trust Territory government was to administer the Trust Territory in such a way as to effectuate Micronesian self determination, the only way to do so was by hiring and training Micronesian citizens. Under this extended logic, few programs that employed people would be protected. Further, Plaintiffs' mere assertions do not satisfy their burden to establish that providing employment was a primary purpose of the program. *See Ward v. Massachusetts Bay Transportation Authority*, 550 F.Supp. 1310, 1311 (D.Mass.1982).

## D. *Title VII Complaints*

Plaintiffs also claim that the district court erred by granting summary judgment to the Federal Defendants and dismissing Title VII claims against the Trust

---

8. Because the Trusteeship Agreement also constituted the basic statutory framework for the Trust Territory of the Pacific Islands, it might also be appropriate to apply the analysis of *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975). The determinative fact to be ascertained under *Cort* is Congressional intent. *Thompson v. Thompson*, 484 U.S. 174, 108 S.Ct. 513, 516, 98 L.Ed.2d 512 (1988); *see Touche, Ross & Co. v. Redington*, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979). Thus, the analysis—as well as the result—is the same.

9. Although drafted by the State, War and Navy Departments and negotiated between the Executive and the United Nations Security Council, the authority was granted by Congress. *See* 61 Stat. at 3301; H.R.Rep. No. 889, 80th Cong., 1st Sess. 3 (1947).

Defendants. Plaintiffs offer, however, no analysis of the summary judgment and discuss only the dismissal. We affirm the district court on both counts.

■ Pursuit of administrative remedies is a condition precedent to a Title VII claim. *Stache v. International Union of Bricklayers*, 852 F.2d 1231, 1233 (9th Cir. 1988). The requirement, however, is not jurisdictional. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982). Equitable conditions may excuse the failure to file an EEOC complaint within the proper time period. *Karim–Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 626 (9th Cir.1988).

■ Plaintiffs offer equitable conditions they claim excuse them from filing EEOC complaints. In particular, they claim that no supervisor informed them of the necessity to file EEOC complaints. The Supreme Court, however, has noted that it "did not in *Zipes* declare that the requirement [of filing an EEOC complaint] need not ever be satisfied; we merely stated that it was subject to waiver and tolling." *Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 152 n. 6, 104 S.Ct. 1723, 1726 n. 6 (1984) (per curiam). Plaintiffs' complete failure to file EEOC complaints cannot be excused.

Trust Defendants point out that Plaintiffs received legal advice as early as 1982. Our prior discussions of equitable tolling focused on bad faith or deviousness by the employer or lack of access to information by the employee. *See, e.g., Villasenor v. Lockheed Aircraft Corp.*, 640 F.2d 207 (9th Cir.1981) (per curiam); *Gates v. Georgia-Pacific Corp.*, 492 F.2d 292, 294–95 (9th Cir.1974). Plaintiffs have not shown bad faith. Therefore, the district court was correct in dismissing plaintiffs' complaint.

### E. Trust Territory Code Claims Against the Federal Defendants

■ Plaintiffs ask this court to consider whether the district court erred in dismissing claims based on 1 T.T.C. § 7 against the Federal Defendants. Plaintiffs make no arguments to support a holding that it did. The district court dismissed for lack of subject matter jurisdiction. It reasoned that 1 T.T.C. § 7 was a local law that did not restrain actions by the United States. 33 Fair Emp.Prac.Cas. at 1066. This analysis is correct.[10] *See Rust v. Johnson*, 597 F.2d 174, 179 (9th Cir.), *cert. denied*, 444 U.S. 964, 100 S.Ct. 450, 62 L.Ed.2d 376 (1979).

### F. Trusteeship Agreement Claims Against the Federal Defendants

The district court dismissed Trusteeship Agreement claims against Federal Defendants for lack of subject matter jurisdiction. Plaintiffs claim jurisdiction under the then current 48 U.S.C. § 1694a. In the alternative, Plaintiffs ask for their claim to be transferred to the Claims Court.

■ At the time Plaintiffs filed their complaint, 48 U.S.C. § 1694a stated:

> The District Court for the Northern Mariana Islands shall have the jurisdiction of a District Court of the United States, except that in all cases arising under the Constitution, treaties, or laws of the United States, it shall have jurisdiction regardless of the sum or value of the matter of controversy.

Plaintiffs claim that the last phrase in the above sentence overcomes the limitations of the Little Tucker Act, which limits federal court jurisdiction over claims against the United States to those that do not exceed $10,000. 28 U.S.C. § 1346(a)(2).

It is fundamental that a "waiver of sovereign immunity 'cannot be implied but must be unequivocally expressed.'" *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980) (quoting *United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969)).

---

**10.** We recognize the fact the Trust Territory Code was originally drafted by the Department of the Interior under authority delegated from Congress. However, local laws enacted under legislative power delegated by Congress are considered territorial rather than federal. *Harris v. Boreham*, 233 F.2d 110, 113 (3d Cir.1956).

In discussing the Tucker Act,[11] the Supreme Court noted that "[t]he Act merely 'confers jurisdiction upon [the Court of Claims] whenever the substantive right exists.' The individual claimants, therefore, must look beyond the jurisdictional statute for a waiver of sovereign immunity with respect to their claims." *Id.* (quoting *United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). Similarly, while the 1982 version of 48 U.S.C. § 1694a may have granted jurisdiction, it did not constitute a waiver of sovereign immunity. *Cf. James v. Ambrose*, 367 F.Supp. 1321, 1326 (D.V.I.1972) (interpreting identical statute governing jurisdiction of the District Court of the Virgin Islands).

■ Plaintiffs alternatively ask that their claim be transferred to the Claims Court pursuant to 28 U.S.C. § 1631. Transfer to the Claims Court would not be proper. The Claims Court has no jurisdiction over claims arising from the Trusteeship Agreement, which is an international agreement. *Nitol v. United States*, 7 Cl.Ct. 405, 417 (1985); *see* 28 U.S.C. § 1502. Under section 1631, the transferee court must have jurisdiction. *McKeel v. Islamic Republic of Iran*, 722 F.2d 582, 591 (9th Cir.1983), *cert. denied*, 469 U.S. 880, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984).

### G. *Addition of Nine Persons to Plaintiff Class*

■ Plaintiffs claim the district court erred in not approving the addition of nine Social Security workers to the class. The district court, after an evidentiary hearing, found that the Social Security compensation plan was not facially discriminatory and ruled that the nine prospective members did not fit into the class. Plaintiffs contend that the pay received by the nine workers was the same as that received by class members and argue that it would be inequitable to exclude them.

A district court has broad discretion over the conduct of a class action trial. *Califano v. Yamasaki*, 442 U.S. 682, 701, 99 S.Ct.

2545, 2557, 61 L.Ed.2d 176 (1979). There are, however, serious repercussions to denial of class status; the district court is subject to review. *Cf. Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99–100, 101 S.Ct. 2193, 2199–2200, 68 L.Ed.2d 693 (1981).

In order for a class to be certified, the members of the class and the named representatives must suffer the same injury. *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 156, 102 S.Ct. 2364, 2369, 72 L.Ed.2d 740 (1982). It is stipulated that named plaintiffs in this case were discriminated against by the three-level compensation plan. The district court found that the nine Social Security workers were not discriminated against by the plan. They did not suffer a common injury; therefore, they could not have been included in the original class, and if joined now would argue a different claim than the rest of the class. Plaintiff has not shown that the district court's findings were clearly erroneous. *See Rathgeb v. Air Cal, Inc.*, 812 F.2d 567, 570 (9th Cir.1987). The district court did not abuse its discretion by ruling that the nine additional workers did not fit into the class.

### III

Even in its twilight, the Trust Territory government raises complex questions. We are compelled, however, to find that Congress did not intend the changes occurring in the Northern Mariana Islands to affect the Trust Territory government. We also fail to find any indication that Congress intended the Trusteeship Agreement to create a monetary remedy for injury. Therefore, we reverse the district court to the extent it determined that it had jurisdiction over the Trust Defendants. We agree with the district court, however, that Titles VI and VII complaints against Trust Defendants and all complaints against Federal Defendants should be dismissed. To that extent, the district court is affirmed.

---

**11.** The Tucker Act outlines the jurisdiction of the United States Claim Court. 28 U.S.C. § 1491.

Each of the parties shall bear their own costs.

AFFIRMED in part and REVERSED in part.

KOZINSKI, Circuit Judge, concurring:

I join in the majority opinion with the exception of Section II(A) disposing of plaintiffs' claims under 42 U.S.C. §§ 1981 and 1983 (1982). While I agree that we lack jurisdiction to hear these claims, I reach that conclusion by a somewhat different route.

The Supreme Court has announced the general rule that "a suit is against the sovereign if 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration.'" *Dugan v. Rank*, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963) (quoting *Land v. Dollar*, 330 U.S. 731, 738, 67 S.Ct. 1009, 1012, 91 L.Ed. 1209 (1947)). In this case, it is undisputed that the Trust Territory's funding consists entirely of United States appropriations. *See Temengil v. Trust Territory*, No. CV–81–0006 (D. NMI Feb. 4, 1985) (Decision) at 19 ("[t]he Trust Territory makes much of the fact that all of its funds trace their source to the federal treasury"). Because any judgment against the Trust Territory would ultimately "expend itself on the public treasury," *Land v. Dollar*, 330 U.S. at 738, 67 S.Ct. at 1012, I would conclude that the "'essential nature and effect of the proceeding,'" *id.* (quoting *Ex parte New York*, 256 U.S. 490, 500, 41 S.Ct. 588, 590, 65 L.Ed. 1057 (1921)), is a suit against the United States.

As the United States cannot be sued without its consent, the question becomes whether the federal government has waived its sovereign immunity. It is well established "that a waiver of the traditional sovereign immunity 'cannot be implied but must be unequivocally expressed.'" *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 953–54, 47 L.Ed.2d 114 (1976) (quoting *United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969)). In ruling that it had jurisdiction over plaintiffs' action, the district court cited *Marcus Garvey Square, Inc. v. Winston Burnett Constr. Co.*, 595 F.2d 1126 (9th Cir.1979), for the proposition that "an action against a federally funded entity is not barred by sovereign immunity where the entity's monies are 'severed from Treasury funds and Treasury control.'" *Temengil v. Trust Territory*, No. CV–81–0006 (D. NMI Feb. 4, 1985) (Decision) at 17–18. This misconstrues the applicable law. In analyzing the Federal Housing Administration's (FHA) amenability to suit, the Supreme Court first determined that the provision in the National Housing Act giving the FHA the power to sue and be sued waived the United States' sovereign immunity. *FHA v. Burr*, 309 U.S. 242, 244, 60 S.Ct. 488, 490, 84 L.Ed. 724 (1940). This waiver made a suit against the agency jurisdictionally proper. *Id.* Only then did *Burr* establish the additional requirement that recovery could only be had from funds in the possession and control of the agency. *Id.* at 250, 60 S.Ct. at 492. We followed *Burr's* two-step analysis in *Marcus Garvey Square, Inc.:* We first determined that the National Housing Act's sue or be sued clause made an action against the FHA jurisdictionally proper. 595 F.2d at 1131. Only then did we proceed to determine whether there were funds in the possession and control of the agency. *Id.*

In this case, plaintiffs have not cited, nor do I find, any waiver of sovereign immunity in the Trusteeship Agreement, the statutes passed by Congress to implement this agreement, or other pertinent legislative acts. As plaintiffs' claims for monetary damages under sections 1981 and 1983 are in essence suits against the United States, and as the federal government has not given its consent to be sued, I would conclude that we have no jurisdiction to hear these claims.