22 F.3d 1464
 64 Fair Empl.Prac.Cas. (BNA) 1018,
64 Empl. Prac. Dec. P 43,014, 62 USLW 2755
 Carolyn ARNO, Plaintiff-Appellant,
v.
CLUB MED INC; Club Med Sales Inc; Club Med Boutique Inc;
Club Mediterranee International Inc; Club Mediterranee S A;
Club Med Management Services Inc, and Does Two through
Fifty inclusive, Defendants-Appellees.
 No. 92-16026.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 3, 1993.
Decided May 4, 1994.
 
 Barbara A. Lawless, Therese M. Lawless, Lawless & Horowitz, San Francisco, CA, for plaintiff-appellant.
 Bettina B. Plevan, Proskauer, Rose, Goetz & Mendelsohn, New York City, for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before: KOZINSKI and O'SCANNLAIN, Circuit Judges, and GEORGE, District Judge.*
 Opinion by Judge KOZINSKI; Partial Concurrence and Partial Dissent by Judge O'SCANNLAIN.
 KOZINSKI, Circuit Judge.
 
 
 1
 Carolyn Arno alleges she was raped by her boss while employed as a gentile organisateure (G.O.) or hostess, at the Club Med resort in Guadeloupe, France.[1] Based on this incident, she raises a variety of tort and contract claims, as well as a claim under Title VII of the Civil Rights Act of 1964. We consider which of these claims she may maintain and--as a preliminary matter--what law applies.
 
 I. Facts
 
 2
 After vacationing at a Club Med resort, Arno decided to apply for a G.O. position. She sent the paperwork to Club Med's New York office and eventually was offered a job at a Club Med resort in the Bahamas. Once there, she signed a six-month employment contract. A few months after she returned to her home in California, the New York office proposed another assignment at the Club Med resort in Bermuda. Arno agreed, flew to Bermuda and there signed her six-month employment contract. Shortly after she returned to the U.S., Arno accepted what turned out to be her last G.O. job at the resort on Guadeloupe. The day after Arno arrived in Guadeloupe, however, she learned that her mother may have had a heart attack, and she quickly made plans to return to the U.S.
 
 
 3
 The sordid events that give rise to Arno's claims occurred the night before Arno was scheduled to leave Guadeloupe, when she walked with her boss, Chef de Village Jeff Planteblat, towards his apartment in the resort. The parties agree that Arno wanted to discuss certain employment-related matters, such as the possibility of returning to work at that resort, but Planteblat could not or would not meet with her earlier in the day. They disagree about what happened when they reached the apartment: Arno claims that Planteblat invited her in and then forced himself on her; Planteblat and Club Med claim the encounter was consensual. Because the case was dismissed on summary judgment, we must accept Arno's version of the facts. Lopez v. Continental Can Co., 961 F.2d 147, 148 n. 1 (9th Cir.1992).[2]
 
 II. Discussion
 
 4
 Arno concedes that the district court in California cannot assert personal jurisdiction over Planteblat because he lacks sufficient contacts with the state.[3] Arno therefore raises a variety of claims against "Club Med" as their common employer.[4] Because the parties disagree as to the choice of law for the state law claims, we resolve that question first.
 
 A. Choice of Law
 
 5
 Although virtually all of the relevant conduct occurred outside California, we still must apply California's choice of law rules in deciding which jurisdiction's law governs Arno's state-law claims. Klaxon Co. v. Stentor Electric Mfg., Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021-22, 85 L.Ed. 1477 (1941); Ledesma v. Jack Stewart Produce, Inc., 816 F.2d 482, 484 (9th Cir.1987). California has jettisoned the relatively predictable choice of law rules based on the place where the transaction occurred (lex locus) in favor of a three-part governmental interest test. Reich v. Purcell, 67 Cal.2d 551, 63 Cal.Rptr. 31, 432 P.2d 727 (1967). Under this amorphous and somewhat result-oriented approach, we must first consider whether the two states' laws actually differ; if so, we must examine each state's interest in applying its law to determine whether there is a "true conflict"; and if each state has a legitimate interest we must compare the impairment to each jurisdiction under the other's rule of law. McGhee v. Arabian American Oil Co., 871 F.2d 1412, 1422 (9th Cir.1989) (citing Offshore Rental Co. v. Continental Oil Co., 22 Cal.3d 157, 161-165, 148 Cal.Rptr. 867, 583 P.2d 721 (1978).
 
 
 6
 When it comes to torts, the laws of California and France do differ. While California allows punitive damages and recognizes vicarious liability based on a ratification theory, French law does not. Thus, we must consider the respective interests of California and Guadeloupe. California claims an interest in providing compensation to its residents, Kasel v. Remington Arms Co., 24 Cal.App.3d 711, 734, 101 Cal.Rptr. 314 (1972),[5] while Guadeloupe has an interest in encouraging local industry, Offshore Rental Co., 22 Cal.3d at 168, 148 Cal.Rptr. 867, 583 P.2d 721, and reliably defining the duties and scope of liability of an employer doing business within its borders, id. at 163-64, 148 Cal.Rptr. 867, 583 P.2d 721; McGhee, 871 F.2d at 1425-26.
 
 
 7
 Both we and the California Supreme Court have resolved these competing interests in favor of the foreign jurisdiction. In McGhee, 871 F.2d at 1425-26, we held that California's connection was insufficient to justify application of California law where a California resident sued his Saudi employer for injuries suffered in Saudi Arabia. Offshore Rental Co., 22 Cal.3d at 168, 148 Cal.Rptr. 867, 583 P.2d 721, concluded that Louisiana, not California law, should govern where the plaintiff was a California resident, but the tort occurred in Louisiana on the premises of the defendant corporation. Louisiana's "vital interest in promoting freedom of investment and enterprise within Louisiana's borders" prevailed over California's interest in compensating residents. Id. By close analogy, we conclude that Arno's tort claims are governed by French law, which prevails in Guadeloupe.
 
 
 8
 Arno's contract claim is based on what she alleges was an implied-in-fact contract with the Club Med office in New York: She was entitled to continue receiving six-month assignments at Club Med resorts throughout the world so long as she performed satisfactorily. Arno asserts that this contract was separate from the written six-month employment contract she signed at each resort where she worked, and that it was breached when Club Med refused to remedy Planteblat's outrageous conduct. This, she claims, caused her constructive discharge.
 
 
 9
 In deciding which law applies to Arno's contract claim, we return to the government interests test.[6] Again, the laws of California and France diverge: California alone recognizes a cause of action for bad faith breach of contract. We thus consider whether each jurisdiction has an interest in applying its law to Arno's implied-in-fact contract. The contract Arno claims to have with the Club Med office in New York has only the most tangential relationship to Guadeloupe; Guadeloupe would seem to have no legitimate interest in applying its law to a contract made in California between a California resident and a British West Indies corporation doing business in New York, especially when the contract governs that resident's assignment to locations outside Guadeloupe and quite likely outside French soil. California, on the other hand, has an interest in protecting the contract rights of its residents, particularly when the resident negotiates those rights from California.
 
 B. Intentional Tort Claims
 
 10
 French law holds employers vicariously liable for certain tortious conduct by their employees. Article 1384 of the French Civil Code provides:
 
 
 11
 A person is responsible not only for the injury which he causes by his own act, but also for that which is caused by the act of persons for whom he is responsible, or things which he has in his care (including) ... [m]asters and employers, for the injury caused by their servants and employees in performing the duties for which they are employed.
 
 
 12
 Three conditions must be satisfied before liability is imposed under Art. 1384: The employer must have authority over the employee; the employee must have committed a fait illicite (wrongful act); and the act must have occurred in the scope of his employment. The real dispute, for purposes of this appeal, is whether Planteblat was acting within the scope of his employment when he allegedly committed the rape.
 
 
 13
 The Cour de Cassation--France's highest court--has defined the scope-of-employment concept broadly. Thus, where a movie house usher, whose job consisted of placing and guiding patrons, was asked for directions to the restroom and proceeded to take the patron to the basement, rape and murder her, the court held the employer liable under Art. 1384 because the crime was "committed by [the usher] during the time and at the place where he exercised his [work] functions" and "these functions gave him precisely the opportunity to commit his crime and allowed him to do it." Judgment of Nov. 5, 1953, Cass. crim., D.Jur. 1953 No. 698.
 
 
 14
 Other opinions of the Cour de Cassation follow in this vein. Where an employee injured a coworker with a job tool as part of a practical joke, the court held the employer liable under Art. 1384 because it found that "the tort was committed in the time and place of work and that the accused ... found through his job the opportunity and the means for his wrong." Judgment of June 23, 1988, Cass. crim., G.P. 1989.1.13, 1er arret (1/7/89). Article 1384 also created vicarious liability for an injury inflicted by one employee on another during a fight after formal working hours. Judgment of Mar. 20, 1968, Cass. crim., 1967 Bull.Crim. No. 98. Another employer was held liable under Art. 1384 because its employee, whose job was to pick up orders for a merchandise store at certain locations, was acting within the scope of employment when he stole some of the packages. Judgment of June 23, 1988, Cass. crim., G.P. 1989.1.13, 2eme arret (1/7/89); see also Judgment of Dec. 6, 1967, Cass. crim., G.P. 1968.1.128 (employer liable under Art. 1384 for employee's theft on customer's premises during lunch break where theft committed "at a place it was necessary for the workers to pass in order to do their work, being still under the supervision of their employer").
 
 
 15
 Planteblat served as Chef de Village for the Guadeloupe Club Med. As Club Med's job description puts it, "He/she manages the village budget, the staff, the activities, the programs.... He/she supervises the teams, motivates them and energetically leads all aspects of life in the village. He/she is the village mediator harmonizing relations, facing problems and solving them ... [e]nsuring the unity and harmony in the village...." CR 152, exh. 13 at A 100411. Planteblat's broad job responsibilities put him in a unique position to elicit the trust of a G.O. and to warrant her seeking advice about returning to work in Guadeloupe and about other employment matters.
 
 
 16
 We fail to see any meaningful distinction between Planteblat's abuse of his job function and that of the movie usher discussed above. Both faits illicites occurred during business hours[7] and on the employer's premises; both victims placed themselves in a vulnerable situation vis-a-vis the perpetrator in the reasonable expectation he would perform his job function. Moreover, Planteblat reaffirmed the link between the assault and his job responsibilities by reminding Arno immediately after the rape that he'd be sending her evaluation to the New York office the following week. A reasonable trier of fact might interpret this as an attempt on Planteblat's part to use his authority as Arno's supervisor to keep her from complaining about his misconduct. Planteblat's job thus gave him the opportunity to rape Arno and the leverage to cover his tracks. This would easily support a finding of vicarious liability under Art. 1384. The district court erred in granting summary judgment to defendants on this count.[8]
 
 C. Breach of Contract
 
 17
 Arno argues that statements by Club Med employees and representations in Club Med brochures form the basis for an implied-in-fact employment contract with the New York office that she would be reassigned to a new resort every six months so long as she performed well. See Foley v. Interactive Data Corp., 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373 (1988).[9] But her reliance on Foley is misplaced. Foley held that "the personnel policies or practices of the employer, the employee's longevity of service, actions or communications by the employer reflecting assurances of continued employment, and the practices of the industry in which the employee is engaged" can give rise to an implied agreement that the employment relationship will continue until the employer has good cause to terminate the employee. Id. at 680, 254 Cal.Rptr. 211, 765 P.2d 373 (quoting Pugh v. See's Candies, Inc., 116 Cal.App.3d 311, 327, 171 Cal.Rptr. 917 (1981)). There was no question in Foley that the parties were engaged in an employment relationship to begin with: Foley was a long-term employee of Interactive Data Corporation with a salary and other terms and conditions of employment. See id. at 663, 254 Cal.Rptr. 211, 765 P.2d 373.
 
 
 18
 Arno claims that during the course of her six-month G.O. jobs, she was praised for her performance and led to expect continuous reassignments so long as she performed well. Arno Br. at 36-40. But these allegations take on no legal significance unless Arno can show what was assumed in Foley: the existence of an underlying employment relationship. She bears the burden of proof on this issue and was obliged to come forward with "specific facts showing there is a genuine issue for trial" to avoid summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).
 
 
 19
 As evidence of employment, Arno points out that she sent her application to New York, received correspondence from that office and then flew to Washington, D.C. (at her own expense) to be interviewed by a New York employee. She later received a call from New York, extending her an offer at the Club Med village in the Bahamas. The New York office also coordinated her airline tickets, job evaluations and preference forms for future assignments with the individual resorts.
 
 
 20
 These facts might support a theory that Arno's relationship to the New York office was akin to that between a job applicant and an employment agency, see, e.g., Travelers Ins. Co. v. Workmen's Compensation Appeals Bd., 68 Cal.2d 7, 15-16, 64 Cal.Rptr. 440, 434 P.2d 992 (1967); Ledbetter Erection Corp. v. Workers' Compensation Appeals Bd., 156 Cal.App.3d 1097, 1105, 203 Cal.Rptr. 396 (1984);[10] they don't substantiate an employer/employee relationship. "Employment" consists of an exchange of compensation for "physical or mental exertion ... controlled or required by the employer...." Tennessee Coal, Iron & Railroad Co. v. Muscoda Local No. 123, 321 U.S. 590, 598, 64 S.Ct. 698, 703, 88 L.Ed. 949 (1944). Arno has not alleged she had any rights or obligations whatsoever vis-a-vis the New York office. Between her six-month jobs at the resorts--each governed by its own employment agreement--Arno received no salary, no insurance coverage, no benefits. CR 152, exh. 22 at B101055. Nor did Club Med require anything of her. While she claims she kept herself available between assignments in reliance on an ongoing employment relationship with Club Med, she doesn't allege she was bound, legally or as a condition of employment, to refrain from other employment. To the contrary, she admits that she was free to terminate her relationship with Club Med after each of her six-month employment contracts came to an end. See, e.g., CR 100, exh. A at 282. If offered a six-month assignment, she could accept or reject it; the choice was hers. CR 191 at 14. Except for the time she was covered by the individual six-month contracts, then, Arno had no contractual relationship at all with Club Med, and certainly no employment contract.
 
 
 21
 This is entirely consistent with the information she was given by Club Med in its brochure for prospective employees: "Each G.O. will have a contract corresponding to his/her arrival date and his/her departure date." CR 152, exh. 22 at B101054. The record thus provides no evidence of an underlying employment relationship with Club Med's New York office into which we can read an implied good cause termination provision pursuant to Foley.
 
 
 22
 Arno's contract claim therefore turns on her written contract with Club Med on Guadeloupe, a contract clearly governed by the law there prevailing. French law supports a constructive discharge theory where an employer's failure to remedy intolerable working conditions forces an employee to quit. CR 176, exh. 1 at 5. Here, however, all the evidence suggests that Arno decided to end her employment for personal reasons before the conditions arose. Arno said she doubted whether she would--or could--have returned to Guadeloupe, CR 152 exh. 2 at 637; indeed, it was one of the issues she wanted to raise with Planteblat. Moreover, she had been told repeatedly that leaving a G.O. post before the season ended would terminate employment at that resort and might preclude ever being rehired by Club Med. Id. at 611. Arno offered no evidence supporting the theory, raised in her Reply Brief, that her departure from Guadeloupe was meant to be temporary and that she was entitled to return before the expiration of the six-month contract.
 
 
 23
 The contract provides no other basis for Arno's breach of contract or bad faith termination claims. Under the terms of French Labor Code Sec. 122-3-6 and those of the contract itself, the Guadeloupe agreement would automatically terminate on the date specified--with no re-employment obligation--unless it were terminated early because of grave fault, force majeure or agreement between the parties. Arno's contract was terminated by agreement: She requested a replacement; Club Med secured one and arranged for transportation to her parents' home. Thus, Arno's contract claims were properly dismissed on summary judgment.
 
 D. Negligent Torts
 
 24
 Arno also asserts claims for negligent infliction of emotional distress, negligent misrepresentation and negligence, arguing that Club Med failed to protect her from rape and sexual harassment and again, that it constructively terminated her in violation of its promise to employ her so long as she performed satisfactorily. To the extent Arno alleges a claim against her employer in Guadeloupe, the district court correctly held that these claims are preempted by the French Social Security System[11] to which Arno's employer contributed on her behalf. To the extent the claims depend on the existence of a separate employment relationship with the New York office, they were properly dismissed for the reasons discussed above. See pp. 1470-71, supra.
 
 E. Title VII
 
 25
 Finally, Arno appeals the grant of summary judgment to the defendants on her Title VII claim. She concedes that she cannot state a claim against Club Med for harassment which occurred on Guadeloupe. Arno Br. at 43. In EEOC v. Arabian American Oil Co., 499 U.S. 244, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991), the Court held that an employer is not liable under Title VII for employment discrimination that occurs outside the United States. Though Congress changed that law in the Civil Rights Act of 1991, the amendment does not apply retroactively. Pub.L. No. 102-166, 105 Stat. 1071, Sec. 109(c).
 
 
 26
 Arno offers a novel twist on Arabian American Oil. She suggests that Club Med employees in New York violated Title VII in the United States by failing to take appropriate investigative or remedial action in response to her complaints of sexual harassment.[12] Arno points to Meritor Savings Bank v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), and several circuit court cases requiring employers to take prompt and effective remedial action against sexual harassment. See, e.g., Waltman v. International Paper Co., 875 F.2d 468, 478-79 (5th Cir.1989); cf. Snell v. Suffolk County, 782 F.2d 1094, 1104 (2d Cir.1986) (racial harassment). In each of these cases, however, the employer failed to respond to conduct that itself violated Title VII. An employer has no obligation under Title VII to provide a remedy where the complained-of conduct is not covered by the statute. Here, the underlying conduct--Arno's alleged rape by Planteblat--didn't violate Title VII because it occurred outside the territorial United States before the Civil Rights Act of 1991 took effect. Thus, the alleged responses of Club Med's New York employees may have been callous, but they don't amount to a Title VII violation.
 
 
 27
 AFFIRMED in part, REVERSED in part and REMANDED.
 
 
 28
 O'SCANNLAIN, Circuit Judge, concurring in part and dissenting in part:
 
 
 29
 I concur entirely in the court's opinion with the limited exception of Part II.C. The majority cites no California law to explain what required element of an employment contract Arno has failed to plead. I would let the issue of whether Arno had an employment contract be decided by a jury. See Foley v. Interactive Data Corp., 47 Cal.3d 654, 682, 254 Cal.Rptr. 211, 765 P.2d 373 (1988).
 
 
 
 *
 The Honorable Lloyd D. George, Chief United States District Judge for the District of Nevada, sitting by designation
 
 
 [1]
 Although closer to the United States than to the French mainland, Guadeloupe is a French Overseas Department, as much a part of France as Hawaii is of the United States
 
 
 [2]
 Other facts, discussed below, should be understood as representing Arno's allegations, some of which are hotly contested
 
 
 [3]
 Arno does not appeal from the order below granting Planteblat's motion to dismiss for lack of personal jurisdiction. Supp. ER 1
 
 
 [4]
 The defendants are, in fact, separate corporate entities, but have accepted Arno's allegation that "Club Med" was her employer for purposes of summary judgment and appeal
 
 
 [5]
 It's not entirely clear why a state has a legitimate interest in having one of its residents collect money from the resident of another jurisdiction based on conduct that occurred outside the state's boundaries. When adjudicating disputes, after all, the state may not legitimately favor a party just because that party lives within its borders. Nonetheless, this interest has qualified as legitimate in California courts. See Kasel, 24 Cal.App.3d at 734, 101 Cal.Rptr. 314
 
 
 [6]
 There appears to be some difference of opinion as to whether California's choice of law rule for contracts is the governmental interest test of Reich v. Purcell, 67 Cal.2d 551, 553, 63 Cal.Rptr. 31, 432 P.2d 727 (1967), or the test of Cal.Civ.Code Sec. 1646 ("A contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made."). Compare Travelers Ins. Co. v. Workmen's Compensation Appeals Board, 68 Cal.2d 7, 13, 64 Cal.Rptr. 440, 434 P.2d 992 (1967) (applying governmental interest analysis to contract claim), and Dixon Mobile Homes, Inc. v. Walters, 48 Cal.App.3d 964, 972, 122 Cal.Rptr. 202 (1975) (same), with Klein v. Superior Court, 198 Cal.App.3d 894, 902, 244 Cal.Rptr. 226 (1988) (applying Cal.Civ.Code Sec. 1646), and Celotex Corp. v. American Ins. Co., 199 Cal.App.3d 678, 683, 245 Cal.Rptr. 429 (1987) (same). Because the contract here doesn't specify a place of performance, Cal.Civ.Code Sec. 1646 requires the court to apply the law of California where the contract was made, i.e., where Arno accepted. See Restatement Second of Contracts Sec. 64, Comment c (contract made in place where acceptance spoken over telephone); E. ALLAN FARNSWORTH, CONTRACTS 171 n. 22 (1982). Because the governmental interest test also supports the application of California law, we need not resolve this apparent conflict among the state courts
 
 
 [7]
 There doesn't appear to be an end to working hours for employees at the Club Med resorts. As Club Med publicizes, "it's not just a job, it's a way of life. G.O.s don't go 'home' at night. Their home, their job, their life, is Club Med...." 1 ER 113. The Chief Hostess also testified that "[t]here are no business hours in the village. The business hours are 24 hours a day." CR 172, exh. 2 at 33
 
 
 [8]
 Arno also alleges tort liability under Arts. 1382 and 1384 of the French Civil Code for intentional infliction of emotional distress by the New York employees who doubted her report and failed to take what she considered to be satisfactory action. This argument was not made below, where Arno only alleged intentional infliction of emotional distress under California law, CR 156 at 26 n. 5, and we will not consider it for the first time on appeal. See Inland Cities Express, Inc. v. Diamond National Corp., 524 F.2d 753, 755 (9th Cir.1975)
 
 
 [9]
 The district court decided this issue on the basis of the parole evidence rule. For purposes of this analysis, we assume, without deciding, that the parole evidence rule does not bar evidence of the alleged long-term contract
 
 
 [10]
 Arno did not raise this theory before us or the district court
 
 
 [11]
 Except for intentional fault, that system covers all claims by employees' on Guadeloupe for work-related injuries--without regard to citizenship
 
 
 [12]
 In addition to the rape on Guadeloupe, Arno claims that she was sexually harassed by the Chef de Village in Bermuda, that she complained to supervisors and that she was told to keep quiet or she'd lose her job