**GUSHI BROTHERS COMPANY; Chuji G. Chutaro; Beverly L. Chutaro, Plaintiffs–Appellees,**

v.

**BANK OF GUAM, Defendant–Appellant.**

**No. 93–16133.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 13, 1994.

Decided July 7, 1994.

Mark E. Cowan and Anita P. Arriola, Arriola, Cowan & Bordallo, Agana, GU, for defendant-appellant.

Douglas F. Cushnie, Saipan CNMI, for plaintiffs-appellees.

Before: FARRIS, BEEZER and RYMER, Circuit Judges.

Opinion by Judge BEEZER.

BEEZER, Circuit Judge:

The Bank of Guam ("Bank") challenges the district court's denial of its motion for judgment as a matter of law or, alternatively, a new trial pursuant to Fed.R.Civ.P. 50(b) as to Gushi Brothers' ("the Chutaros") claim for violation of the Bank Holding Company Act, 12 U.S.C. §§ 1971–1978.[1] The Bank contends that the court used an improper legal standard and that there was insufficient evidence to support the verdict in the Chutaros' favor. The Bank also challenges the district court's exclusion of the deposition of its branch manager, Droteo Espangel, who died

---

1. Because we treat the issues raised by the Chutaros in their cross-appeal in a separate memorandum disposition, we omit the issues pertinent to their cross-appeal here.

prior to trial. We have jurisdiction pursuant to 28 U.S.C. § 1291. Because we conclude that the district court lacked subject matter jurisdiction over this claim, we do not address the merits of the Bank's appeal. We remand with instructions to the district court to vacate the judgment and the resulting award of costs and fees.

## I

Gushi Brothers is a proprietorship registered in the Republic of the Marshall Islands. Gushi Brothers is primarily engaged in wholesale and retail sales and is owned and managed by Chuji and Beverly Chutaro. The Chutaros maintained a commercial account under the Gushi Brothers trade name at the Majuro branch of the Bank of Guam, after the Bank assumed Bank of America's operations in the Marshall Islands in 1981. The Bank, organized under Guam law, was the only commercial banking facility operating in Majuro.

In August 1986, investigators alerted Bank officers in Guam to the fact that the Chutaros' account was overdrawn [2] by approximately $500,000. On August 24, the Bank's president, Leon Guerrero, and its general counsel, Arriola, appeared at the Chutaros' residence in Majuro. According to Mrs. Chutaro's testimony at trial, Leon Guerrero, through intimidation, required the Chutaros to execute a promissory note for $506,169.82 payable in sixty days. The note was secured by real and personal property located in the Republic of the Marshall Islands. The parties at trial identified revenue from sales by Gushi Brothers as the contemplated source of repayment for the loan.

Relations between the Chutaros and the Bank deteriorated in the ensuing months. Mrs. Chutaro testified that the Bank refused to honor those checks most urgently requiring clearance per her request. The Bank also unilaterally drew funds from a Gushi Brothers account as payment for its legal fees and loan installments, causing several checks to be returned for insufficient funds. The Chutaros subsequently opened an account at the newly-established Bank of the Marshall Islands, a local, non-FDIC-insured entity. Citing difficulties meeting their obligations, the Chutaros wrote to the Bank seeking an extension of the loan. By a letter dated September 22 sent from the Bank's headquarters in Agana, Guam, Leon Guerrero rejected the Chutaros' offer to renegotiate the note and added: "We also learned that you have opened an account with another bank. This account must be closed immediately. All deposits must be made to our bank."

On November 10, 1988, the Chutaros filed this action on behalf of themselves and Gushi Brothers, alleging, inter alia, violation of § 1972(1) [3] of the Bank Holding Company Act. Finding that the Bank violated the Act, the jury awarded the Chutaros $50,000. This sum was trebled pursuant to 12 U.S.C. § 1975.[4] The district court entered Judgment on February 26, 1993. The Bank moved for judgment as a matter of law or, alternatively, for a new trial. The court denied relief as to the Bank Holding Company

2. The Gushi Brothers account was subject to a continuing overdraft facility or line of credit secured by a $100,000 Certificate of Deposit. At trial, the parties contested the proper characterization of this banking feature and disputed whether the arrangement permitted drafts above the amount of the collateral Certificate of Deposit. This dispute is not relevant to the issues on appeal.

3. 12 U.S.C. § 1972(1) provides, in pertinent part, that:

[a] bank shall not in any manner extend credit ... on the condition or requirement
(A) that the customer shall obtain some additional credit, property, or service from such bank other than a loan, discount, deposit, or trust service;

... or

(E) that the customer shall not obtain some other credit, property, or service from a competitor of such bank, ... other than a condition or requirement that such bank shall reasonably impose in a credit transaction to assure the soundness of the credit.

4. 12 U.S.C. § 1975 provides, in pertinent part, that:

[a]ny person who is injured in his business or property by reason of anything forbidden in section 1972 ... shall be entitled to recover three times the amount of the damages sustained by him, and the cost of suit, including a reasonable attorney's fee.

Act claim and entered an amended Judgment, including an award of attorney's fees of $30,472.72 and costs of $820.90 on May 20, 1993. The Bank timely appealed.

While the appeal was pending, we, by order, requested counsel to address whether Congress intended to extend the reach of the Bank Holding Company Act antitying provisions to transactions occurring wholly within the Republic of the Marshall Islands and, thus, whether the district court had subject matter jurisdiction over the Chutaros' claim. Through argument and supplemental authority, the parties disputed whether the Chutaros' claim arose exclusively out of the Bank's operations within the Republic of the Marshall Islands. They also disputed whether the antitying provisions of the Bank Holding Company Act apply of their own force to the Republic of the Marshall Islands and whether the statute or its legislative history reveals an express Congressional intent to apply the Act to the Republic of the Marshall Islands.

## II

We have consistently treated the question of whether Congress intended to exercise the full scope of its prescriptive jurisdiction as a question of subject matter jurisdiction. *See, e.g., SEC v. United Fin. Group, Inc.,* 474 F.2d 354, 356–57 (9th Cir. 1973). The question of subject matter jurisdiction may be raised by any party, or by motion of the court, at any time, including on appeal. *Gregorian v. Izvestia,* 871 F.2d 1515, 1526 n. 8 (9th Cir.1988), *cert. denied,* 493 U.S. 891, 110 S.Ct. 237, 107 L.Ed.2d 188 (1989). We review de novo the district court's exercise of subject matter jurisdiction. *Kruso v. Int'l Tel. & Tel. Corp.,* 872 F.2d 1416, 1421 (9th Cir.1989).

## III

The Chutaros contend that, regardless of the rules governing the application of federal law to the Republic of the Marshall Islands, sufficient actionable conduct occurred within the territory of the United States to invoke the district court's jurisdiction. They underscore the fact that the Bank is chartered under Guam law, has its headquarters there and, as a member of the Federal Reserve System, is subject generally to extensive Congressional regulation.

Questions involving 'the reach of Congress' prescriptive jurisdiction are not implicated when the conduct sought to be regulated occurs within the United States. *Environmental Defense Fund, Inc. v. Massey,* 986 F.2d 528, 531 (D.C.Cir.1993). We look to the conduct proscribed by the particular legislation and to the impact of the conduct within the United States. *United Financial Group,* 474 F.2d at 356–57. Conduct occurring within the United States which, standing alone, is merely preparatory or incidental to the proscribed conduct does not confer federal court jurisdiction. *Id.; see also Subafilms, Ltd. v. MGM–Pathe Comm. Co.,* 24 F.3d 1088, 1090–95 (9th Cir.1994) (en banc) (the mere authorization within the United States of extraterritorial acts of infringement does not state a violation of the Copyright Act, 17 U.S.C. § 101 *et seq.* (1988)).

The factors cited by the Chutaros for the proposition that actionable conduct did not occur exclusively in the Republic of the Marshall Islands are inapposite. Section 1972(1) of the Bank Holding Company Act proscribes certain anticompetitive tying arrangements, reciprocal agreements and exclusive dealing contracts. *See, e.g., Bruce v. First Fed. Sav. and Loan Ass'n of Conroe, Inc.,* 837 F.2d 712, 715 (5th Cir.1988). The conduct supporting the Chutaros' claim stemmed from the Bank's extension of credit, memorialized in the promissory note executed on August 25, 1986 (the tying product under their theory) and from the condition, conveyed in the September 22 letter, that the Chutaros close their account at the Bank of the Marshall Islands (the tied product or the exclusive dealing condition). It is undisputed that the execution of the loan agreement, promissory note and security agreement, as well as the preliminary discussions between the Chutaros and Bank president Leon Guerrero, took place exclusively in Majuro, in the Republic of the Marshall Islands, in August 1986. The demand conveyed in the September 22 letter, moreover, affected only the Chutaros' relations with an entirely local bank. That the

letter may have been sent from the Bank's headquarters in Agana, Guam is merely incidental to any allegedly actionable conduct.

## IV

■ Having determined that the banking transactions occurred exclusively within the Republic of the Marshall Islands, we next consider the conditions upon which the antitying provisions of the Bank Holding Company Act could be said to apply to the Republic of the Marshall Islands.

### A

The Republic of the Marshall Islands is a former administrative district of the Trust Territory of the Pacific Islands ("Trust Territory"). As a district of the Trust Territory, the Marshall Islands, as they were then known, were administered pursuant to a Trusteeship Agreement ("Agreement") entered into between the United Nations Security Council and the United States.[5] *Porter v. United States*, 496 F.2d 583, 587 (Ct.Cl. 1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975); *See* Trusteeship Agreement for the Former Japanese Mandated Islands, art. 6.1, July 18, 1947, United Nations–United States, 61 Stat. 3301, T.I.A.S. No. 1665. As presently constituted, the Republic of the Marshall Islands is "a fully independent, sovereign nation[ ]." *Temengil v. Trust Territory of the Pacific Islands*, 881 F.2d 647, 650 (9th Cir.1989), *cert. denied*, 496 U.S. 925, 110 S.Ct. 2617, 110 L.Ed.2d 638 (1990). Section 121 of the Compact of Free Association, which currently governs relations between the United States and the Republic of the Marshall Islands, acknowledges the Republic's plenary control over the conduct of its foreign affairs, including "commercial, diplomatic, consular, economic, trade, *banking*, postal, civil aviation, communications, and cultural relations." Compact of Free Association Act of 1985, Pub.L. No. 99–239, Jan. 14, 1986, 99 Stat. 1770 (emphasis added), *reprinted in* 48 U.S.C. § 1681 note. In recognition of this broad autonomy, § 171 of the Compact provides, in pertinent part, that "the application of the laws of the United States to the Trust Territory ... by virtue of the Trusteeship Agreement ceases with respect to the Marshall Islands ... as of the effective date of the Compact." *Id.* Save for exceptions not relevant here, the Compact instructs us to consider the Republic a foreign nation for purposes of determining the applicability of federal legislation after the Compact's entry into force on October 21, 1986.[6] *See* Proclamation No. 5564, 51 Fed.Reg. 40,399 (1986), *reprinted in* 48 U.S.C. § 1681 note; *see also In re Bowoon Sangsa Co., Ltd.*, 720 F.2d 595, 600 (9th Cir.1983) (noting that federal law applies to the former districts of the Trust Territory only by mutual agreement under the Compacts of Free Association).

The transactions underlying the Chutaros' claim took place in August and September 1986, during the brief transitional interval between the Marshall Islanders' ratification of free association status and the Compact's formal entry into force. We must, therefore, look beyond the terms of the Compact to resolve the question before us. In this respect, the Chutaros underscore the Marshall Islands' close dependency on the United States under the Agreement and the new Republic's relative lack of power to protect against abusive banking practices. These factors, in their view, establish that the antitying provisions of the Bank Holding Company Act apply of their own force to transactions taking place within the Republic of the

---

5. The Agreement was ratified by a joint Congressional resolution on July 18, 1947. *Porter v. United States*, 496 F.2d 583, 587 (Ct.Cl.1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975).

6. This conclusion is inescapable when we contrast § 171 of the Compact with § 502(a)(2) of the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America ("Covenant").

A result of separate negotiations between the United States and the former Trust Territory district of the Northern Mariana Islands, the Covenant expressly made applicable to the Commonwealth "those laws ... which are applicable to Guam and which are of general application to the several States as they are applicable to the several States." *Temengil*, 881 F.2d at 651 (quoting Covenant, § 502(a)(2), *reprinted in* 48 U.S.C. § 1681 note).

Marshall Islands during this transitional period.

We disagree. We have never considered the Trust Territory as simply a United States territory or insular possession. *See In re Rothstein,* 884 F.2d 490, 491 (9th Cir. 1989); *McComish v. Commissioner,* 580 F.2d 1323, 1330 (9th Cir.1978) (determining that the Trust Territory is a "quasi-sovereign" entity). We have also never presumed that the Trust Territory was automatically subject to United States laws. *Temengil,* 881 F.2d at 651. Article 3 of the Trusteeship Agreement provided, in pertinent part, that the United States "may apply to the trust territory ... such of the laws of the United States as it may deem appropriate to local conditions and requirements." Trusteeship Agreement, art. 3 (quoted in *Porter,* 496 F.2d at 587). The Trust Territory Code, promulgated pursuant to the Agreement, provided only that American common law was to apply to the Trust Territory during the period of United States administration. 1 Trust Territory Code § 103 (1980). In *Temengil,* we rejected the contention that Congress intended 42 U.S.C. §§ 1981 and 1983 to apply to the districts, including the Marshall Islands, under the Trust Territory government's nominal control. 881 F.2d at 651–52. In doing so, we expressly adopted the construction set forth by the District of Columbia Circuit, concluding that "the laws of the United States do *not* automatically apply to the [Trust] Territory unless they are specifically made applicable by Congress." *Id.* at 651 (quoting *Gale v. Andrus,* 643 F.2d 826, 830 (D.C.Cir.1980)) (internal quotations omitted).

### B

■ The conclusion we reached in *Temengil* is consistent with the deference federal courts have traditionally shown to Congress when applying the presumption against extraterritoriality. *See Benz v. Compania Naviera Hidalgo, S.A.,* 353 U.S. 138, 147, 77 S.Ct. 699, 704, 1 L.Ed.2d 709 (1957). The Supreme Court recently reaffirmed the principle that federal legislation is presumed to apply only within the territorial jurisdiction of the United States, unless the legislation clearly expresses a contrary intent on the part of Congress. *EEOC v. Arabian Am. Oil Co. ("ARAMCO"),* 499 U.S. 244, 248, 111 S.Ct. 1227, 1230, 113 L.Ed.2d 274 (1991). The presumption against extraterritoriality furthers the principle that "[r]ules of the United States statutory law, whether prescribed by federal or state authority, apply only to conduct occurring within the territory of the United States." Restatement (Third) of Foreign Relations Law of the United States § 403, comment (g) (1987). This "canon of construction ... is a valid approach whereby unexpressed congressional intent may be ascertained," *Foley Bros. v. Filardo,* 336 U.S. 281, 285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949), and "protect[s] against the unintended clashes between our laws and those of other nations which could result in international discord." *ARAMCO,* 499 U.S. at 248, 111 S.Ct. at 1230.

Our examination of the evolving history of the relations between the United States and the Marshall Islands reveals that the Republic was in a practical and legal sense a foreign nation when the instant banking transactions occurred. The peculiar legal status of the nascent, constituent states of the former Trust Territory has rendered them resistant to simple classification. *Temengil,* 881 F.2d at 651.[7] The relationship between

---

7. We have on occasion analogized the Trust Territory to the territories or possessions of the United States for purposes of determining the applicability of particular federal legislation. In *People of Saipan v. Department of Interior,* 502 F.2d 90, 94–95 (9th Cir.1974), *cert. denied,* 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975), we rejected the contention that the Trust Territory government is a foreign sovereign for the limited purpose of determining whether it must be granted foreign sovereign immunity in judicial proceedings in the United States. We concluded, however, that the Trust Territory government was excluded from review under the Administrative Procedure Act, in part, in recognition of its unique quasi-sovereign status. *Id.* Alternatively, we have characterized the Trust Territory as a foreign country. We concluded in *McComish,* 580 F.2d at 1330, that the Trust Territory government is a quasi-sovereign entity for purposes of determining whether a salary drawn by a Trust Territory employee was foreign income under Federal Tax regulations.

The Trust Territory's resistance to simple classification is reflected in the decisions of other

the United States and the emerging states of the Trust Territory has necessarily been an evolving one, as the United States has continued to carry out its mandate to steward Micronesia to self-government. *Andrus*, 643 F.2d at 830. This has been especially true since the middle 1970s, when the district known as the Northern Mariana Islands elected Commonwealth status. *Temengil*, 881 F.2d at 650. By 1979, the Trust Territory government was divested of most of its functions, and the remaining districts of the Trust Territory gained an increasing measure of control over their internal affairs. *Id.; see* Secretarial Order No. 3039, 44 Fed. Reg. 28116 (May 14, 1979). The districts followed distinct paths during this transitional period. On June 25, 1983, the government established by the newly-named Republic of the Marshall Islands determined to pursue free association status and negotiated and signed the Compact of Free Association. Proclamation No. 5564, *reprinted in* 48 U.S.C. § 1681 note. The government's decision was democratically ratified, in accordance with the Republic's constitutional processes, in a United Nations-sponsored plebiscite conducted on September 7, 1983. *Id.*

■ We have grappled with the implications of the increasing measure of sovereignty gained by the former Trust Territory districts during this transitional period. In doing so, we have implicitly adhered to the principle that the concept of sovereignty "is a pliable one for purposes of resolving domestic jurisdictional disputes." *Porter*, 496 F.2d at 588–89. For instance, in *In re Bowoon Sangsa*, 720 F.2d at 601, we considered the case of the district of Palau. We rejected the contention that the impending independence of Palau rendered its courts "foreign" for purposes of determining whether they were subject to orders issued in conjunction with limitation proceedings brought in courts of the United States. We cited the continued

United States domination of the Trust Territory High Court, through its appellate jurisdiction, and the rejection by the people of Palau of free association status, reasoning that the rejection of free association promised a continuation of United States domination for an unforeseen period of time.[8] *Id.* In contrast, in *United States v. Covington*, 783 F.2d 1052, 1056 (9th Cir.1985), *cert. denied*, 479 U.S. 831, 107 S.Ct. 117, 93 L.Ed.2d 64 (1986), we considered the Marshall Islands which, as noted above, expressly ratified free association status two years before the events at issue occurred. We concluded that violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), by Marshall Islands police did not require the application of the exclusionary rule to judicial proceedings in the United States, absent the factual finding that they acted as agents of the United States government. *Id.* We reached this conclusion on the basis of *United States v. Chavarria*, 443 F.2d 904, 905 (9th Cir.1971) (holding that the Mexican police's violation of Mexican law did not implicate the exclusionary rule). We reasoned that *Chavarria* applied because the Marshall Islands, like Mexico, was at that time "undeniably a foreign country." *Id.* at 1055.

■ We see no contradiction between the conclusions we reached in *In re Bowoon Sangsa* and *Covington*. "Trust Territories are *sui generis*. Each one must be viewed independently to determine the rights granted to its citizenry, the rights reserved to itself, and those possessed by the federal government." *Fleming v. Department of Public Safety*, 837 F.2d 401, 404 (9th Cir.), *cert. denied*, 488 U.S. 889, 109 S.Ct. 222, 102 L.Ed.2d 212 (1988). Although we do not necessarily lend talismanic significance to any single event, there is no question that

Circuit Courts. *See, e.g., Porter*, 496 F.2d at 591 (concluding that the United States cannot be sued on a contract entered into by the administrator of the Trust Territory, as the territory is not an agency or instrumentality of the United States); *Andrus*, 643 F.2d at 830 (holding that Trust Territory need not comply with a request under the Freedom of Information Act on the independent and alternative bases that it is not

an agency of the United States, it is not explicitly referred to as being within the scope of the Act and it shares enough similarities with United States territories to be exempt).

8. In fact, the Trusteeship Agreement remained in effect for Palau until the late 1980s. *Temengil*, 881 F.2d at 650–51.

the Republic of the Marshall Islands was, after the ratification of free association status in the September 1983 plebiscite, "undeniably a foreign country" for purposes of resolving domestic jurisdictional disputes. This fact is attested to not only by the Presidential Proclamation memorializing the Compact's subsequent entry into force, which referred to the plebiscite as a *"sovereign act of self-determination,"* Proclamation No. 5564 (emphasis added), but also by the declaration on May 26, 1986 by the United Nations Trusteeship Council, *see id.,* that the United States had satisfactorily discharged its duties under the Agreement. Although we recognize the unique relationship that existed under the Agreement, we conclude that the Republic of the Marshall Islands possessed sufficient indicia of sovereignty during the transitional interval prior to the Compact's entry into force to be considered outside the territorial jurisdiction of the United States and, thus, subject to the presumption against extraterritoriality.

## V

Whether we rely on the rule in *Temengil* or apply the presumption against extraterritoriality does not affect our analysis. In either event, we must determine whether Congress expressly intended to extend the antitying provisions of the Bank Holding

Company Act to transactions occurring wholly within the Republic of the Marshall Islands. In *ARAMCO,* the Supreme Court considered whether Title VII of the 1964 Civil Rights Act applied to regulate the employment practices of United States firms that employ American residents abroad. 499 U.S. at 247, 111 S.Ct. at 1229. Finding no express intent within the statute save for "boilerplate language which can be found in any number of congressional Acts," *id.* at 251, 111 S.Ct. at 1232, the Court held that the presumption applied to bar the Title VII claim of a United States resident alien against his employer. *Id.* at 259, 111 S.Ct. at 1236.

 The methodology adopted by the Supreme Court in *ARAMCO* is conclusive.[9] There is no dispute that the Bank is subject to the antitying provisions of the Bank Holding Company Act.[10] The Chutaros, however, were unable to discern an express statement of Congressional intent to apply the statute to banking transactions within the Trust Territory, the Marshall Islands or to purely foreign banking activities in "the Act itself ... or in its legislative history." *Foley Bros.,* 336 U.S. at 285, 69 S.Ct. at 577. We similarly find none within the language of the statute beyond the "boilerplate" and generic language considered inadequate by the *ARAMCO* court.[11] We especially consider notable

---

9. The fact that *ARAMCO* has been superseded by statute in the Title VII context, *see, Arno v. Club Med, Inc.,* 22 F.3d 1464 (9th Cir.1994), does not undermine the soundness of the Court's methodology.

10. 12 U.S.C. § 1972 provides that the antitying provisions apply to "a bank...." The chapter's definitional provisions at 12 U.S.C. § 1971 provide that "the term[ ] "bank" ... [has] the meaning ascribed to [this] term[ ] in [12 U.S.C. § 1841]." Sections 1841(c)(1)(A) and (c)(1)(B), in pertinent part, define "bank" as including "[a]n insured bank as defined in section 3(h) of the Federal Deposit Insurance Act [12 U.S.C. § 1813(h)] [*i.e.* "any bank (including a foreign bank having an insured branch)....]" and "any institution organized under the laws of the United States, any State of the United States, the District of Columbia, any territory of the United States, Puerto Rico, Guam, American Samoa, or the Virgin Islands ...," respectively. Section 1841(c)(2)(A) excepts from the definition of "bank," "[a] foreign bank which would be a bank within the meaning of paragraph (1) solely

because such bank has an insured or uninsured branch in the United States."

Because the Bank of Guam is organized under the laws of Guam, it is a "bank" within the purview of the Act by virtue of § 1841(c)(1)(B).

11. With the passage of the International Banking Act of 1978, 12 U.S.C. § 3101 *et seq.,* Congress extended the antitying provisions of the Act to "any foreign bank that maintains a branch or agency in a State...." 12 U.S.C. § 3106. Section 3101(10) defines "State" narrowly to mean "any State of the United States or the District of Columbia." The express exclusion of foreign banks without branches in a State or the District of Columbia from the reach of the Act reflects a concern for international comity.

Although the question is not now before us, in response to the Chutaros' contention that the Republic of the Marshall Islands is virtually powerless to protect against abusive banking practices, we note that the Bank of the Marshall Islands, an apparent "victim" of the Bank's conduct under the Chutaros' theory of liability, was orga-

that when, in 1981, Congress sought to extend the regulatory reach of the Federal Deposit Insurance Act to the Trust Territory it did so by *expressly* referring to the Trust Territory rather than by employing a generic designation. *See* International Banking Facility Deposit Insurance Act, Pub.L. 97–110, 95 Stat. 1513, *codified at* 12 U.S.C. § 1811 *et seq.* (1981); *see also Robinson v. Harbert Int'l, Inc.*, 743 F.Supp. 797, 799 (N.D.Ala. 1989) (noting that Congress amended the Fair Labor Standards Act in 1966 to *expressly* include work performed in the Kwajalein Atoll, in the Marshall Islands), *aff'd without op.*, 912 F.2d 1423 (11th Cir.1990); *People of Enewetak v. Laird*, 353 F.Supp. 811, 815 n. 8 (D.Haw.1973) (listing statutes containing express reference to Trust Territory). In light of Congress' specific reference to the Trust Territory in its amendment of the FDIA, its failure to specifically amend the definitional provisions of the Bank Holding Company Act is determinative. Because the Bank Holding Company Act does not expressly encompass banking transactions within the Trust Territory, the Republic of the Marshall Islands or entirely outside the territory of the United States, we conclude that the Chutaros failed to overcome the high threshold of demonstrating that Congress intended to reach transactions taking place wholly within the Republic of the Marshall Islands.

## VI

The Chutaros alternatively contend that the close analogy between the Bank Holding Company Act and the Sherman and Clayton Antitrust Acts reflects a Congressional intent to apply its provisions extraterritorially.

The close analogy between the Bank Holding Company Act and the Sherman and Clayton Antitrust Acts has been previously noted. *See, e.g., Parsons Steel v. First Alabama Bank of Montgomery*, 679 F.2d 242, 245 (11th Cir.1982) ("the purpose and effect of § 1972 is to apply the general principles of the Sherman Antitrust Act prohibiting anticompetitive ... [practices] specifically to the field of commercial banking"). We have followed the majority of Circuit Courts in borrowing from antitrust jurisprudence as an aid to construing the Bank Holding Company Act and other statutes proscribing anticompetitive practices by depository institutions. *See Sundance Land v. Community First Fed. Sav. & Loan*, 840 F.2d 653, 659–61 (9th Cir.1988) (applying antitrust standing principles to the Home Owners' Loan Act, 12 U.S.C. § 1461 *et seq.*); *see also McGee v. First Federal Sav. & Loan Ass'n*, 761 F.2d 647, 648 (11th Cir.) (applying two products and coercion requirements to BHCA), *cert. denied*, 474 U.S. 905, 106 S.Ct. 273, 88 L.Ed.2d 234 (1985); *see generally Mid–State Fertilizer Co. v. Exchange National Bank of Chicago*, 877 F.2d 1333 (7th Cir.1989) (discussing applicability of antitrust principles). Even prior to the passage of the Foreign Trade Antitrust Improvement Act of 1982, 15 U.S.C. § 6a,[12] which explicitly created limited extraterritorial jurisdiction under the Sherman Act, we had "firmly concluded that there is some extraterritorial jurisdiction under the Sherman Act." *Timberlane Lumber Co. v. Bank of America National Trust & Savings Ass'n*, 549 F.2d 597, 610 (9th Cir. 1976). We have similarly construed the federal Securities and Commodities statutes. *See, e.g., Grunenthal GmbH v. Hotz*, 712

---

nized under the laws of the Republic of the Marshall Islands, operated only in Majuro and was not FDIC-insured. As such, it was not brought within the purview of the Bank Holding Company Act by the express provisions of § 1841 or § 3106. Short of our concluding that banks such as the Bank of the Marshall Islands were impliedly brought within the purview of the Act pursuant to the generic phrase "any territory of the United States" in § 1841(c)(1)(B), a dubious proposition redolent with serious international political consequences, our extension of the Act to reach the instant loan transaction would be tantamount to putting the Bank at a competitive disadvantage vis a vis its local competitor in what is essentially a foreign nation. A clear

expression of Congressional intent to effect such an outcome is especially warranted under these circumstances.

12. The statute provides, in pertinent part, that:

[The Sherman Act] shall not apply to conduct involving trade or commerce ... with foreign nations unless—(1) such conduct has a direct, substantial, and reasonably foreseeable effect— (A) on trade or commerce which is not trade or commerce with foreign nations ... or (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States....

F.2d 421, 421–22 (9th Cir.1983); *Des Brisay v. Goldfield Corp.*, 549 F.2d 133, 136 (9th Cir.1977).

We need not decide whether the jurisdictional reach of the Bank Holding Company Act is as broad as that of the Sherman Act because even if it were, the district court lacked jurisdiction over this case. The Chutaros failed to allege in their pleadings that the Bank's conduct resulted in any anti-competitive effects within the territory of the United States or to demonstrate any such effects at trial. Although they adopt the position now, we find wholly incredible that an isolated loan had a "substantial, and reasonably foreseeable effect ... on ... commerce which is not ... commerce with foreign nations ... or ... on ... export commerce with foreign nations, of a person engaged in such ... commerce in the United States" within the meaning of 15 U.S.C. § 6a or *Timberlane*.[13] In any event, the Chutaros' failure to establish any anticompetitive domestic effect was jurisdictional. *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 814 (9th Cir.1988).

### VII

We remand to the district court to dismiss the Chutaros' Bank Holding Company Act claim and to vacate the award of costs and fees entered pursuant to 12 U.S.C. § 1975. Because this was the only issue on which the Chutaros prevailed, the court should also vacate costs awarded to the Chutaros as prevailing parties pursuant to Fed.R.Civ.P. 54(d).

**REVERSED AND REMANDED.**

---

**13.** Under the *Timberlane* standard, we look to whether there is some effect on American foreign commerce, to whether the effect is sufficiently large "to present a cognizable injury to the plaintiffs" and to whether the "interests of, and links to, the United States ... are sufficiently strong ... to justify an assertion of extraterritorial authority." 549 F.2d at 613.